# Exhibit A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-----------------------------------------------------------------------X

ASHU SHUKLA, **Index No.:**

Plaintiff,

-against- **SUMMONS**

META PLATFORMS INC. (Previously known as FACEBOOK INC.),
DELOITTE CONSULTING LLP,

Defendant.

-----------------------------------------------------------------------X

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff within twenty-one (21) days after the service of this Summons, exclusive of the date of service; and in the case of your failure to appear or answer, judgment will be taken against by default for the relief demanded in this complaint.

Dated: October 25th 2023,
New York, New York

**Yours,**
Ashu Shukla
_s_ashu shukla
Plaintiff
202 Salem CT, Apt#11
Princeton, NJ 08540
ashu.shukla@gmail.com
T # 917-488-6143

TO:

META PLATFORMS INC. (Previously known as FACEBOOK INC.),
1 Hacker Way, Bldg 20,
Menlo Park,
California, CA 94025

DELOITTE CONSULTING, LLP
30 Rockefeller Plaza
New York, NY 10112

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------------------X

ASHU SHUKLA, **Index No.:**

Plaintiff,

-against-

**VERIFIED COMPLAINT**

META PLATFORMS INC. (Previously known as FACEBOOK INC.),
DELOITTE CONSULTING LLP,

Defendant.

---------------------------------------------------------------------------X

Plaintiff, ASHU SHUKLA (hereinafter "Plaintiff"), as and for his Complaint against defendant META PLATFORMS INC. (Previously known as FACEBOOK INC.), DELOITTE CONSULTING LLP ("Defendant"), alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction of the claims that arise under US Federal laws and New York laws.

2. Venue is proper because at least one of the parties resides in New York County.

3. Plaintiff ASHU SHUKLA is a resident of New Jersey and a former employee of the Deloitte Consulting LLP.

4. Plaintiff ASHU SHUKLA applied for multiple fulltime position at Facebook. Facebook selected plaintiff's profile, however, refused to hire the plaintiff.

5. Upon information and belief, Defendant DELOITTE CONSULTING LLP ("Deloitte"), is a foreign corporation with its principal place of business located 30 Rockefeller Plaza, New York, NY 10112. Deloitte Consulting LLP is a Delaware Partnership.

6. Upon information and belief, Defendant META PLATFORMS INC. (Previously known as FACEBOOK INC.) (also known as "Meta" or "Facebook"), is a foreign corporation with its principal place of business located 1 Hacker Way, Bldg 20, Menlo Park, California 94025.

7. This is a civil action seeking monetary relief, compensatory damages, disbursements, costs and fees for violations of Plaintiff's rights resulting from Facebook Inc.'s failure to hire the plaintiff in violation of U.S. Federal laws, New York State employment laws, and retaliation.

8. Specifically, Plaintiff alleges that Defendants Facebook Inc. negligently, intentionally, and knowingly sought and did wrongfully deprive him of his employment, position, title, and pay through discrimination and retaliation and by failing to hire him.

9. Plaintiff also alleges that Defendant intentionally, recklessly, and knowingly sought to maintain an illegal control of his federal and state civil and constitution rights, his personal liberty, his life, health, personal wellbeing, employment opportunities and willfully discriminated against him. Plaintiff alleges that Defendant purposefully and intentionally, violated plaintiff's civil and constitutional rights and committed other wrongful acts after his termination of employment.

10. The alleged acts against Plaintiff were done knowingly, purposely, and with all intentions of depriving him of his right to be free of discrimination and retaliation for purposes of employment with the defendant Facebook Inc.

11. The Federal and State Court of New York, New York have subject matter jurisdiction, supplemental jurisdiction as well as remedial authority over this case pursuant to the various federal civil right laws, federal statutes, state law violations and common law torts.

12. This is a civil action seeking monetary relief, compensatory damages, injunctive relief, disbursements, costs and fees for violations of Plaintiff's rights resulting from plaintiff not being hired for a fulltime job opportunity by defendant, Meta Platforms Inc. (Facebook Inc.), in violation of U.S. Federal laws, New York State employment laws, and retaliation.

13. The Federal and State Court of New York, New York have jurisdiction over this matter since (a) the Defendants Deloitte and Meta Platforms Inc. (Facebook Inc.) maintain a place of business New York County where the Plaintiff was employed, (b) Plaintiff submitted an enquiry on the Equal Employment Opportunity Commission (EEOC) Portal on 10/23/2023, and charge of discrimination and a request for notice of right to sue per EEOC guidelines on 10/24/2023, and (c) plaintiff's claims are valid in both Federal and State courts.

14. Deloitte has continued to retaliate against the plaintiff, and such continuing violations is the basis of this complaint.

## PARTIES AND RELEVANT INDIVIDUALS

15. Plaintiff, ASHU SHUKLA, is a former employee of Defendant DELOITTE CONSULTING, LLP, ("Defendant Deloitte" or "Deloitte").

16. Plaintiff, ASHU SHUKLA, applied to various employment opportunities at Defendant META PLATFORMS INC. (Previously known as FACEBOOK INC.) ("Defendant Meta" or Meta, or "Defendant Facebook" or Facebook),

17. Defendant, DELOITTE CONSULTING LLP, is a professional services firm that provides consulting services to a wide range of clients. The parent company of Deloitte Consulting LLP is Deloitte LLP. Deloitte LLP employs over 300,000 employees globally. Upon information & belief, in 2022, Deloitte LLP had total revenues of over $50,000,000,000 (Fifty Billion USD)

18. Defendant, META PLATFORMS INC. (also known as "Meta" or "Facebook", Previously known as "Facebook Inc."), is a multinational technology company headquartered in Menlo Park,

California, that designs, develops and owns social media platforms, and relies on advertising for a vast majority of its revenue. Facebook employs over 60,000 employees globally. Upon information & belief, in 2022, Facebook had total revenues of over $100,000,000,000 (One-Hundred Billion USD).

19. On October 24th 2023, the plaintiff requested Notice of Right to Sue (NTRS) from the Equal Employment Opportunity Commission (EEOC) San Francisco office against defendant Facebook. Interviews with the EEOC are not available for the next 3-4 months, and in such situations based on plaintiff's experience, EEOC immediately issues a notice of right to sue based on a valid charge of discrimination. Signed valid charge of discrimination per EEOC guidelines was submitted by the plaintiff to EEOC San Francisco office on October 24th 2023.

20. Defendants are subject to Federal laws and State laws of the State of New York.

## STATE ACTORS

21. Upon knowledge and belief, Deloitte has engaged or worked with one or more State Actors to work against the interests of the plaintiff

22. Upon knowledge and belief, Deloitte employed Mr. Austin Perez, a State Actor or an individual who engaged in conduct that otherwise may be considered as State Action, as a Deloitte talent relation professional. Mr. Perez, an attorney, worked to support the discriminatory interests of Deloitte, and conducted biased investigations. The person maintained a discriminatory animus against the plaintiff as identified later on this complaint. Upon knowledge and belief, Mr. Austin Perez worked with DOJ, law enforcement or intelligence services to support the interests of Deloitte.

23. Similarly, Upon knowledge and belief, Deloitte employed Ms. Joanna Rohde, who has continually engaged in conduct that otherwise may be considered as State Action. As a supervisor, Joanna had directed subordinates like Austin Perez to take action against the plaintiff, had actual knowledge of subordinate's violation of plaintiff's rights and acquiesced in such violations, and had acted with deliberate indifference to the consequences or had established or

maintained a policy, practice or custom which directly caused a violation (e.g. incomplete ethics violation investigation).

24. Similarly, upon knowledge and belief, Joanna worked or collaborated with Deloitte employed State Actors in India over a long period of time. Upon knowledge and belief, such State Actors were a part of Indian intelligence service or law enforcement. The plaintiff believes that Deloitte continues to employ or work with such state actors on special projects or on contractual basis.

25. Upon knowledge and belief, a female previously working for Deloitte and Joanna Rohde, got selected into Indian Civil Services within the last 2-3 years. She was then re-hired to work for Deloitte on a special project. She has been supporting the interests of Deloitte as an Indian government person or intelligence service agent for the last 2-3 years.

26. The plaintiff has previously identified that as a Deloitte talent relations professional, Joanna Rohde, has maintained continuous surveillance over the plaintiff in order to mitigate the risks around her malicious acts. In February 2023, upon knowledge and belief, she influenced or forced several female professionals (including intelligence services or law enforcement professionals) supporting Deloitte to follow and track the plaintiff at a night club in National Capital Region, India (NCR Delhi). The event took place at the night club named "Paso" at Noida on the evening of February 18th 2023, a location with CCTV cameras installed.

27. The fact that such female professionals are State actors can be further validated from the fact that on or around February 19th 2023, the plaintiff saw the above identified intelligence services professional riding a government vehicle and following the plaintiff.

28. One can infer that multiple instances of such offenses are unlikely to be coincidental.

29. Upon knowledge and belief, as part of discovery, depositions or interrogatories, this female Indian professional has a duty to disclose the identities or government affiliations of Joanna Rohde, her UK Colleague and the females supporting Deloitte who followed the plaintiff into the night club.

30. Joanna has worked to support the discriminatory interests of Deloitte, and as a Deloitte talent relation professional, Joanna has conducted biased investigations. Joanna has maintained a discriminatory animus against the plaintiff as identified later on this complaint.

31. Joanna intentionally and deliberately interviewed Christina more than one month after the event dated December 14th 2017 such that the CCTV images from the event could not be accessed. It can be inferred that in order to protect the interests of Financial Services Partners and herself, Joanna had a motive to ensure that Christina was interviewed only after the CCTV images from the event were automatically erased (as normal course of business).

## FACTS

32. Plaintiff ASHU SHUKLA is a 39-year-old male of Indian national heritage who suffers from serious allergies which cause anaphylactic reactions and disability when triggered.

33. The plaintiff would like to incorporate by reference Paragraphs 21 to 32 from his complaint against Apple Inc., dated April 8th 2021, filed at the District Court of the Southern District of New York here (see case# 1:21-cv-03287-LTS, Doc# 1)

## I. Discrimination based on Medical Condition / Disability

## Discrimination by Deloitte based on Plaintiff's Medical Condition / Disability

34. In order to provide the necessary information and proper background on the matter, the plaintiff would like to incorporate by reference Paragraphs 33 to 48 from his complaint against Apple Inc., dated April 8th 2021, filed at the District Court of the Southern District of New York here (see case# 1:21-cv-03287-LTS, Doc# 1)

### 1.1 Deloitte had access to Plaintiff iPhone

35. After joining Deloitte, as part of Deloitte's corporate phone policy, plaintiff enrolled his personal smart phone (iPhone) number (ending in *6143) into his employer Deloitte Consulting LLPs corporate phone network.

36. After the plaintiff transferred his Phone into Deloitte supported phone network, Deloitte Consulting LLP required the plaintiff to install various applications. The installation of such applications required plaintiff's iPhone password.

37. The plaintiff complied with Deloitte corporate policy and allowed Deloitte to install applications which required iPhone administrator password or root access. The plaintiff provided his iPhone passcode for such installation.

38. Upon knowledge and belief, supported by testimonies provided on the Federal court docket, Deloitte had the ability to image or clone a Phone, or have realtime access to Phone communication and data through such applications or access.

39. Upon knowledge and belief, after Deloitte learnt about plaintiff's disability / medical condition, Deloitte maintained a continuous surveillance over plaintiff's phone communications.

40. Upon knowledge and belief, Deloitte accessed or acquired plaintiff's personal emails, messages, calendar, phone logs, call records etc. through such applications, access or covert means.

41. Such abuse of technology allowed Deloitte access plaintiff's personal data, including his personal phone calls, mails and messages to his relatives or relationships, plaintiff's real-time location and travel within the United States, and his personal communications or interviews with other corporations.

42. Deloitte specifically gained access to plaintiff's regular and frequent phone communications and messages with his then girlfriend, Dr. Niti Aggarwal, a Cardiology graduate from Mayo Clinic, MN, working as a Cardiologist at University of Wisconsin, Madison. This information was specifically valuable to Deloitte because Deloitte knew that the plaintiff suffered from a disability / medical condition, and Dr. Niti Aggarwal could stand against the interests of Deloitte as a Physician and a witness to plaintiff's condition.

## 1.2 Discrimination against Dr. Niti Aggarwal in coordination with Deloitte

43. Specifically, after the plaintiff filed his ethics and integrity complaint, Dr. Niti Aggarwal, Cardiologist at University of Wisconsin, Madison, was falsely accused of same, similar or repetitive discriminatory themes on or around same or similar time by her employer. Around the same time the plaintiff also provided witnesses as evidence against Deloitte's Letter of Reprimand, and the plaintiff briefed Deloitte Leaders from plaintiff's Business Unit that he had suffered a medical issue on December 14th 2017 event.

44. The timing and sequence of events, combined with the details of the allegations made against the plaintiff and Dr. Niti Aggarwal, suggest that the events are unlikely to be coincidental. It may be inferred that in order to maintain an illegal control over the plaintiff and his rights, Deloitte targeted plaintiff's girlfriend, Dr. Niti Aggarwal, by extending their discriminative and retaliatory influence to her employer.

45. The accused employees on plaintiff's ethics complaint, in coordination with Deloitte Human Resource Professionals, falsely accused the plaintiff of "not being liked by the Client or his teammates", when in-fact, Sr. Client Leaders continued to attend every meeting led by the plaintiff, continued to praise plaintiff's work and efforts on those meetings, continued to pay Deloitte thousands of Dollars for Plaintiff's Work. Similarly, plaintiff's teammates organized a release party on plaintiff's project release at a prestigious venue in Atlanta, and accused supervisors repeatedly enquired whether the plaintiff would be able to attend the event. The plaintiff was not able to attend the event due to his allergies and discussion calls about his next project assignment/s.

46. Similarly, Dr. Niti Aggarwal's supervisors and human resource professionals at University of Wisconsin, Madison, falsely accused Dr. Niti Aggarwal on same or similar discriminatory themes, on or around same or similar time. Specifically, Dr. Niti Aggarwal was falsely accused

on not being liked by her junior fellows or residents, when in-fact, her junior fellows or residents adored or loved her.

47. The sequence and timing of the events is important because during the same or similar time, Deloitte targeted the plaintiff and discriminated against him on the basis of his disability / medical condition, gender, race and national origin as identified on this complaint. The temporal proximity of the discriminatory events, combined with the Pattern of discrimination indicate that both Deloitte and University of Wisconsin were motivated to limit the civil and constitutional rights of the plaintiff and Dr. Niti Aggarwal, and were motivated to create baseless or false acquisitions which would help them both cite defense and limit liability in case of a potential claim or lawsuit.

48. Deloitte was specifically motivated to target the plaintiff and Dr. Niti Aggarwal, because of the nature and extent of plaintiff's discrimination and Whistle Blower allegations. Upon knowledge and belief, given the numerous stakeholders involved, it may be inferred that Deloitte must have done a cost benefit analysis, and must have estimated that if plaintiff were to expose the malicious, improper and discriminatory behavior of Deloitte, including its Leaders, Partners and HR Professionals, the costs of such damage (in terms of loss of reputation, lawsuits, liability, etc) would easily surpass any positive benefits earned by keeping the plaintiff or Dr. Niti Aggarwal employed without any defense.

## <u>Discrimination by Facebook based on Plaintiff's Medical Condition / Disability</u>

49. While working at Deloitte, the plaintiff filed his written ethics and integrity complaint in February 2018. By filing his ethics and integrity complaint within Deloitte, the plaintiff engaged in a protected activity.

50. On February 28th 2018, the plaintiff received an email from Facebook recruiter to enquire whether the plaintiff was interested in working at Facebook as a full-time employee.

51. Specifically, Facebook was seeking a Product focused Market Strategist for their Menlo Park, California, office. The Market Strategist role required the individual to analyze market trends, educate product leaders of market landscape, and help drive their core products strategy.

52. The timing of the email received from Facebook dated February 28th 2018 is extremely important. The events at Deloitte just before the date help establish the facts that intertwined factors based on plaintiff's Whistle Blower Complaint, combined with Deloitte's discrimination against the plaintiff based on his disability, gender, and race as identified on this complaint, provided the necessary impetus for Deloitte to coordinate with and confer with the Human Resource and recruiting department of Facebook.

53. Similar to their coordination with recruiters for a position at JP Morgan on Monday, December 18th 2017 as identified above, upon knowledge and belief, Deloitte coordinated with and conferred with the Human Resource and recruiting department of Facebook on or around February 28th 2018.

54. Upon knowledge and belief, Deloitte coordinated with and conferred with the Human Resource and recruiting department of Facebook to prevent the plaintiff from securing alternate visa-sponsored employment and to shelter themselves from liabilities on one or more related matters.

55. After defendant Deloitte learned about plaintiff's medical condition and disability caused when allergies were triggered, and after the plaintiff filed his Whistle Blower Complaint internally, Deloitte wanted to limit their liability on related matters.

56. First, in order to limit their liability, Deloitte targeted Dr. Niti Aggarwal. Deloitte coordinated and conferred with Dr. Niti's employer to allege false allegations to ensure that her position as a strong witness on plaintiff's case was negatively impacted.

57. Second, in order to limit their liability, Deloitte scanned for ways in which they may get entangled into extended statutes and periods of litigation.

58. Upon knowledge and belief, Deloitte learned that one or more immediate female relatives of the plaintiff either worked for Deloitte or Facebook, and such females had government affiliations. Specifically, Deloitte as a firm learned that the parents of such females currently or previously

worked for the Indian Government. Upon knowledge and belief, Deloitte employee Joanna Rohde already had prior knowledge of such relations and wanted to conceal her involvement.

59. Importantly, Defendant Deloitte had a significant presence in India, and maintained a place of Business in India. Deloitte talent relations team, led and supervised by Joanna Rohde, worked with one or more government professionals or officials in India.

60. Upon knowledge and belief, plaintiff's female relative working for Facebook in India, also travelled to and worked at Facebook in the United States.

61. Since Deloitte determined that plaintiff's female relatives with government affiliations either worked for Deloitte or Facebook, and since Deloitte had already discriminated against Dr. Niti Aggarwal, Deloitte intentionally and wantonly took steps to mitigate their risks on the matter because of the following reasons.

62. First, Deloitte engaged or worked with one or more State Actors to work against the interests of the plaintiff

63. Second, Deloitte knew that both Federal and State Laws allowed extended periods of litigation for people with government affiliations.

64. Third, Deloitte knew that if individuals with government affiliations were engaged in any form of discriminatory activity, the entire set of Deloitte employees and witnesses would get extended statutes and periods of litigation against Deloitte

65. Fourth, since the above identified plaintiff's relatives were females, Deloitte knew that if such individuals with government affiliations were engaged in any form of discriminatory activity, the entire set of Deloitte employees and witnesses would get a direct inference of gender discrimination.

66. Fifth, on February 27th 2018, one day prior to receiving the recruitment email from Facebook, the 62-year-old female Christina Young had provided inconsistent statements on her sexual harassment allegation against the plaintiff to Deloitte supervisor Joanna Rohde.

67. Since the plaintiff had already defended himself by providing proof of his disability and medical condition, Defendant Deloitte knew it would be illegal to terminate the Plaintiff based upon his medical condition and temporary disability which occurred when his allergies were triggered. So instead, defendant Deloitte sought to retaliate against the plaintiff by coordinating with and conferring with human resource and recruiting team at Facebook to arrange a fraudulent recruitment process.

68. Similarly, since the accuser Christina Young herself had provided one or more inconsistent statements on her sexual harassment allegation against the plaintiff, Defendant Deloitte knew that such inconsistent statements may provide an inference of discrimination or retaliation to the plaintiff. So defendant Deloitte sought to retaliate against the plaintiff by intentionally arranging fraudulent recruitment process where the plaintiff was destined not to be hired.

69. Similarly, Defendant Deloitte knew retaliating against female relatives of the plaintiff may generate extended litigation opportunities due to involvement or association with one or more state actors.

70. With benefit of hindsight, one may infer that in order to shelter themselves from liabilities and extended litigation possibilities, defendant Deloitte coordinated with and conferred with the Human Resource and recruiting department of Facebook to build defense on such matter.

71. By preventing the plaintiff from securing alternate fulltime employment at Facebook, Deloitte Talent Relation leader Joanna Rohde specifically wanted to block or dissuade the members from Deloitte Business Unit team from exploring her past relationships or affiliations with members of the intelligence service community, including former Indian leader Mr. Musk (name concealed) and his daughter who worked for Facebook, or block such members from retaliating against them.

72. On or around July 2007, Mr. Musk emailed the plaintiff to invite him for dinner at a prestigious Indian armed forces club (or academy) in Mumbai, India. Since Deloitte and Joanna had access to plaintiff's emails and communications, Joanna knew about plaintiff's relationships.

73. Specifically, Deloitte knew that children of certain government employees have certain legal considerations and protections in place. Such children have heightened privacy or security measures in place due to the sensitive or classified work by their parents, are protected from undue influence and harassment, and their security or privacy may be subject to bi-lateral treaties between governments.

74. Upon knowledge and belief, Joanna previously acted as a civil or military law / judicial enforcement or intelligence service professional, and had past working relationships or affiliations with members of the intelligence service community. Upon knowledge and belief, based on her classified credentials, she may protect her identity by changing her name or by not disclosing facts to the public. Moreover, as previously identified, at Deloitte, Joanna engaged in conduct that should be considered as state action.

75. In addition, it can be inferred that by preventing the plaintiff from securing alternate fulltime employment at Facebook, Deloitte Talent Relation leader Joanna Rohde specifically wanted to dissuade the members from Deloitte Business Unit team from exploring her relationship and coordination with Christina Young on the malicious sexual harassment allegation, and direct attempts to serve the interests of Deloitte Partners Jonston and Fernandez regardless of their discriminatory acts. For example, Christina accused the plaintiff of having the meeting with the client without her present, when in fact, the plaintiff had no such meetings as the client project, which was due to start in London, did not even start.

76. The matters are important because first Deloitte Business Unit leaders provided a fraudulent letter of reprimand to the plaintiff and threatened the plaintiff with termination, and then Deloitte Business Unit leaders decided to assign the plaintiff with a negative or poor performance rating regardless of plaintiff's performance. Such discussions or decisions were taken in collaboration or coordination with members of Deloitte talent relations team, including Supervisor Joanna Rohde and Austin Perez.

77. Based on the discriminatory acts of Deloitte leaders, such as retaliation against the plaintiff after the December 14th 2017 event by Deloitte Financial Services Leaders in form of project releases, etc. as identifed, or retaliation against the plaintiff by providing a frivolous letter of reprimand which falsely accused the plaintiff of being inebriated on two occasions by Leaders from his

Business Unit, and based on the evidence plaintiff had to support his claims in February and March 2018, Deloitte knew that plaintiff had a valid retaliation claim against Deloitte. Deloitte knew that their retaliation against the plaintiff was in-part based on plaintiff's disability / medical condition.

78. Thus, in order to mitigate their risks, Deloitte first retaliated against Dr. Niti to negatively impact her position as a witness, and then coordinated with Facebook to build or claim immunity.

79. On April 3rd 2018, the plaintiff received an email from Facebook that his profile was not selected.

80. On April 5th 2018, without informing the plaintiff, Deloitte policy makers agreed that the plaintiff should not be put on a low performer list, given the **risks** associated with putting the plaintiff on a low performer list. Specifically, Deloitte policy makers identified and discussed that the plaintiff may claim retaliation by tying the two issues (a) issuing a fraudulent or false letter of reprimand (LOR) and threats of termination for not signing the LOR, and (b) placing the plaintiff on low performer list together.

81. However, in early 2018, the plaintiff continued to receive positive feedback on his internal project work at Deloitte. Deloitte policy makers not only failed to inform the plaintiff about any performance related issues, they intentionally concealed such information such that the plaintiff may not claim retaliation as identified. In addition, the plaintiff was never informed and was never aware that there existed a low-performer list and the plaintiff could have been a part of this exclusive list.

82. On April 5th 2018, in order to build immunity or defense on their biased actions against the plaintiff, Deloitte policy makers, including talent relation professional Austin Perez, sought to retaliate against the plaintiff by further agreeing to assign the plaintiff a negative performance rating yet disclosing it only later during the year-end review. Such rating was intentionally provided despite plaintiff's good performance.

83. On April 6th 2018, Deloitte talent relation professional Austin Perez held a call with the plaintiff. On this call, Deloitte talent relation professional Austin Perez failed to explain the scatter-plot that was just provided to the plaintiff. The scatter plot contained a dot on a page, and failed to

provide any information or underlying details on how the dot was derived or calculated. Instead of addressing the concerns raised by the plaintiff on his ethics and integrity complaint, Mr. Austin Perez kept on saying that he does not see any problems with plaintiff's scatter-plot. Mr. Austin Perez specifically mentioned that did not see or identify any performance issues.

84. Previously, plaintiff's female counselor, Sai Hampankatta, had failed to explain the relevance of scatter-plot to the plaintiff. She had failed to explain how the scatter-plot was derived or calculated. In early 2017, she told the plaintiff that the plaintiff would receive a new hire rating despite plaintiff's performance, and after that the plaintiff had no discussion on scatter-plot with her.

85. On April 6th 2018, the behavior and statements made by Mr. Austin Perez over the phone were directly opposite to the statements recorded by him on his internal notes or memos. In fact, his notes are in-line with his recent discussions with Deloitte Policy making Supervisors, and not with the plaintiff.

86. At this point, Deloitte knew that had Mr. Austin Perez identified any performance issues at this point in time, or mentioned that the plaintiff would definitely be assigned a negative performance rating despite his good performance, the plaintiff could have claimed retaliation. Hence, Deloitte deliberately, intentionally and wantonly choose not to disclose or mention any such details to the plaintiff in April 2018.

87. On April 6th 2018, on his call with the Plaintiff, Deloitte talent relations professional Mr. Austin Perez mentioned that he could not substantiate plaintiff's concerns on the basis of scatter plot containing one dot just received by the plaintiff. However, Mr. Austin Perez (a) failed to provide his investigation process or methodology to the plaintiff, (b) failed to provide his reasoning or rationale as to how or why he failed to consider the series of facts provided by the plaintiff on his written complaint, or (c) failed to discuss why he did not interview the witnesses identified by the plaintiff on his ethics and integrity complaint.

88. On April 6th 2018, on his call with the Plaintiff, Deloitte talent relations professional further maintained a dismissive tone. Based on his own incomplete or inconsistent investigation of plaintiff ethics complaint, and based on lack of details provided on scatter plot, Mr. Perez tried

to convey or advance his theory that he no longer felt plaintiff's ethics and integrity complaint was necessary. The plaintiff directly questioned Mr. Austin Perez over the phone "whether Mr. Perez was suggesting the plaintiff to withdraw his complaint"?

89. On April 6th 2018, on his call with the Plaintiff, alarmed by plaintiff's questions and perseverance, Mr. Austin Perez immediately said that he was not suggesting the plaintiff anything, and the plaintiff should let him know. The plaintiff never asked Perez to rescind his complaint, as the plaintiff had clear and convincing evidence to support his claims. However, Mr. Austin Perez falsified or deliberately wrongly paraphrased the plaintiff on his internal notes, that the plaintiff would like to rescind his complaint because he no longer felt it was necessary.

90. Importantly, since the plaintiff had clear and convincing evidence or valid inferences on the issues raised by him on his ethics complaint, it would not be in the best interest of the plaintiff to rescind his complaint. Even more so because Deloitte continued to discriminate or retaliate against the plaintiff such as forcing the plaintiff to sign a fraudulent letter of reprimand or face termination.

91. Upon knowledge and belief, Deloitte recorded calls with talent relation professionals. Thus, plaintiff's call dated with April 6th 2018 Mr. Austin Perez was recorded or should have been recorded by Deloitte. At no point in time the plaintiff said or mentioned that he would like to rescind his complaint because details on his ethics complaint were not discussed or provided.

92. This is further substantiated by (a) the inconsistent statements made by Mr. Austin Perez on his internal memo, (b) the fact that Deloitte had already decided to assign the plaintiff a negative performance rating despite his performance, and (c) Deloitte never informed or notified the plaintiff about his ethics and integrity complaint, or that his ethics complaint was or will be closed.

93. With benefit of hindsight, one may infer that just three days after Facebook notified that they shall not hire the plaintiff, Deloitte talent relation professional Austin Perez falsified the outcome on plaintiff's ethics and integrity investigation on April 6th 2018, in order to build immunity or defenses around Deloitte's discrimination against Dr. Niti Aggarwal, defenses around plaintiff's

female relatives with government affiliation, and defenses in order to mitigate their risks on related matters as identified above.

94. Deloitte talent relations executive Joanna Rohde was the supervisor of Austin Perez. Joanna had directed her subordinate Mr. Austin Perez to conduct an investigation on plaintiff's ethics and integrity complaint, and oversaw the investigation. Joanna was aware and had knowledge of the discriminatory acts by Mr. Austin Perez against the plaintiff and acquiesced in such violations.

95. At all times was Joanna Rohde aware of the direct facts and supporting evidence or witnesses cited on plaintiff's ethics and integrity complaint, yet, in order to provide defense to defendant Deloitte, Joanna acted with deliberate indifference to the issues identified by the plaintiff. At all times was Joanna aware of the risks associated with overlooking facts and evidence, omitting or ignoring witness testimonies, etc., yet displayed substantial departure from accepted professional judgment, practice, or standards on the issues raised by the plaintiff.

96. Joanna's departure from accepted professional judgment, practice, or standards demonstrated that she did not base her decisions on the facts, evidence, witness testimonies or arguments presented by the plaintiff on his ethics and integrity complaint. But instead, Joanna recklessly discriminated against the plaintiff and violated plaintiff's rights by basing her decisions on the business needs and perceived business liabilities of Deloitte.

97. Similarly, Joanna was aware of the inconsistent or incomplete investigation by Mr. Austin Perez, yet remained indifferent to the risks or consequences of such discriminatory acts. At all times was Joanna aware of the risks associated with misrepresentation or misconduct by her subordinate, yet continued to overlook facts and intentionally misguide Mr. Perez.

98. Additionally, one may also infer that given the gender discrimination matter against the plaintiff, Joanna deliberately used a male subordinate to conceal her own coordination with female supervisors and professionals within Deloitte.

99. Based on the pattern of behavior and internal notes or memos by Deloitte, especially those compiled by Mr. Austin Perez, one can further infer that Joanna and female supervisors within Deloitte used male Supervisors like Binu Janardhanan, and male investigators like Austin Perez,

to falsify evidence or falsely accuse the plaintiff on discriminatory acts, while female supervisors like Ashley Scorsatto were only set to provide superficial justifications for discriminatory acts. Upon knowledge and belief, such male employees like Binu Janardhanan were later incentivized by Deloitte, including Promotion and tuition-sponsorship for MBA.

100. By intentionally assigning a negative performance rating on his client work at Deloitte, despite positive feedback and recommendations from clients, defendant **Deloitte engineered a false non-discriminatory reason for plaintiff's termination**. Thus, one may infer that the discriminatory practices of Deloitte senior policy making officials, like Joanna Rohde and/or Brenda Arends, were so persistent or widespread as to constitute a custom or usage under law.

101. Since senior policy making officials, like plaintiff's human resource supervisor Brenda Arends, either had an input on or directly influenced plaintiff's termination, their acts or edicts may fairly be said to represent the official policy of defendant, Deloitte Consulting LLP.

102. At all times defendant Deloitte was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff

103. Based on the above arguments, it can be inferred that by preventing the plaintiff from securing alternate visa-sponsored employment at Facebook, both Deloitte and Facebook acted with a "**community of purpose**" to shelter themselves from liabilities and extended litigation possibilities. Given that Facebook employed plaintiff's female relative with government affiliation, and Deloitte employed or used a State Actor on the issue, **Facebook shared the intent or purpose** of the principal actor/s "Deloitte" or "Joanna Rohde" that the plaintiff be denied employment opportunities.

104. It can be inferred that both Facebook and Deloitte shared the **same intent or community of purpose** that had plaintiff been selected and recruited by Facebook, the Deloitte female supervisors who raised gender discrimination issues against the plaintiff or the Deloitte female/s with a protected characteristic or factors such as pregnancy may **entangle both Facebook and Deloitte into needless litigation** based on both plaintiff's employment and the employment of plaintiff's female relatives, and such litigation can be initiated during an extended period of time.

105. Upon knowledge and belief, since such situations allowed the state actors, law / judicial enforcement or intelligence services professionals, or people engaging in conduct that may be considered as state action, to conceal their prior relations / affiliations or conceal their own malicious and discriminatory acts.

106. It can also be inferred that such individuals supporting Deloitte deliberately wanted to take advantage of their positions or prior knowledge of situations, in order to create defense for themselves.

107. For example, Joanna Rohde worked with Deloitte Financial Services Partners as identified, and previously targeted the plaintiff using a similar pattern of recruitment tactics at J.P. Morgan Chase to shield the interests of Deloitte Financial Services Partners Jonston and Fernandez, and shield her personal collaboration with such Partners.

108. Upon knowledge and belief, Joanna Rohde knew that the husband of plaintiff's female relative from Facebook, worked or provided business services or solutions to J.P. Morgan Chase. Thus, it can be inferred that on or around December 18th 2017, in order to target the plaintiff right after his disability event on the night of December 14th 2017, Joanna coordinated with external recruiters from the Scotland group to concoct fraudulent recruitment for a position at J.P. Morgan Chase. This provides inference on the internal coordination between Financial Services Partners and Joanna Rohde on the matter.

109. It can be inferred that recruitment action was initiated to shield Joanna's personal interests, and the interests of Deloitte Financial Services Partners Jonston and Fernandez, under the umbrella of protecting the privacy and security of plaintiff's female relative and her family given their government affiliations.

110. Finally, based on the above arguments, it can be inferred that the law enforcement professional (See State Actor Austin Perez) employed by Deloitte and the Facebook recruiters had a 'meeting of the minds', and thus reached an understanding that plaintiff should be refused or denied recruitment opportunities at Facebook.

111. It can be further inferred that such understanding or agreement (express or tacit) was based in-part on plaintiff's disability, gender and race based discriminatory events at Deloitte, in-part on plaintiff's Whistle Blower retaliation ethics and integrity complaint, in-part on the existence of plaintiff's female relative working at Facebook, and in-part on State Actor Joanna's affiliations and relationships with government officials.

112. For the years 2018-2023, Plaintiff was similarly situated to Facebook White female employees, Kelly Lundy. Both plaintiff and Kelly had almost the same or comparable number of years of work experience. Kelly worked on similar positions that required similar skill, effort, and job responsibilities at Facebook, which is comparable to plaintiff's Client Consulting work at Deloitte. Kelly was subject to the same standards of fulltime employment discrimination laws at Facebook, as the plaintiff at Deloitte. She had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

113. For the years 2018-2023, Kelly Lundy was hired and internally promoted by Facebook for similar positions that the plaintiff applied to, however, the plaintiff was not hired. Upon knowledge and belief, Kelly Lundy did not suffer from a life-threatening allergies or disability. Kelly also lacked plaintiff's diverse work experience dealing with several multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

114. Upon knowledge and belief, unlike the plaintiff, similar situated applicants like Kelly Lundy did not file a ethics and integrity complaint with their previous employer, did not have a relative with government affiliation working for Facebook, and her circumstances did not threaten Facebook with extended litigation possibilities.

115. Similarly, Plaintiff was more qualified than similarly situated White employees Stephen Largen, Blake H., etc. These applicants were hired for similar position/s after Facebook started their recruitment process with the plaintiff. Upon knowledge and belief, such similarly situated applicants did not suffer from life-threatening allergies or disabilities were hired by Facebook. Plaintiff had more experience in terms of diverse Client Consulting Experience in different

industries over 8+ years that gave him an added advantage as an applicant. Such actions show that Facebook was unwilling to provide non-discriminatory employment opportunity as a fulltime employee to the plaintiff.

## II. Discrimination Based on Gender

### Discrimination by Deloitte based on Plaintiff's Gender

116. The plaintiff would like to incorporate by reference Paragraphs 72 to 155 from his complaint against Apple Inc., dated April 8th 2021, filed at the District Court of the Southern District of New York here (see case# 1:21-cv-03287-LTS, Doc# 1)

### Discrimination by Facebook based on Plaintiff's Gender

117. Facebook recruiter Ernie Molleri selected plaintiff profile and reached out to the plaintiff. The plaintiff was qualified for the position at all times. However, since Deloitte had access to plaintiff's phone and email communications, and involved law enforcement or intelligence service state actors working as Deloitte talent relation professionals on plaintiff's investigations, given the business interests of both Facebook and Deloitte were at stake, the sequence of events provide an inference that Deloitte communicated with and coordinated with Facebook recruiter on plaintiff's recruitment.

118. It can be inferred that in order to establish that the business interests of both Deloitte and Facebook were at stake, Facebook was **informed or was made aware** of the nature of investigation or facts on plaintiff. Had Facebook not known about (a) malicious sexual harassment allegation against the plaintiff by a White woman twice the age of plaintiff, (b) existence of plaintiff's female relatives as Facebook employee with heightened privacy and security needs given their government affiliations, (c) and the fact that Facebook could be entangled into extended periods of litigation because of such factors, one can infer that Facebook would not have refused to hire the plaintiff.

119. Given the business interests of both Facebook and Deloitte were at stake and based on the arguments identified on the previous section, it can be inferred that the **White** law enforcement professional (See State Actor Austin Perez) employed by Deloitte and the Facebook recruiters had a 'meeting of the minds', and thus reached an understanding that plaintiff should be refused or denied recruitment opportunities at Facebook.

120. It can be further inferred that such understanding or agreement (express or tacit) was based in-part on plaintiff's disability, gender and race based discriminatory events at Deloitte, in-part on plaintiff's Whistle Blower retaliation ethics and integrity complaint, in-part on the existence of plaintiff's female relative working at Facebook, and in-part on State Actor Joanna's affiliations and relationships with government officials.

121. As a Deloitte female supervisor, Joanna Rohde was aware of the inconsistent or incomplete investigation by her subordinate Mr. Austin Perez, yet remained indifferent to the consequences of such discriminatory acts. At all times was Joanna aware of the risks associated with misrepresentation or misconduct by her subordinate, yet continued to overlook facts and intentionally misguide Mr. Perez.

122. By not informing the plaintiff about the sexual harassment issue, and by supervising or conducting an incomplete and inconsistent investigation on plaintiff's ethics and integrity complaint, Joanna established or maintained a policy, practice or custom that directly caused a violation of plaintiff's Federal and State protected rights.

123. It can be inferred that both Facebook and Deloitte shared the **same intent or community of purpose** that had plaintiff been selected and recruited by Facebook, the Deloitte female supervisors who raised **gender discrimination** issues against the plaintiff or the Deloitte female/s with a **protected characteristic or factors such as pregnancy** may entangle both Facebook and Deloitte into needless litigation based on both plaintiff's employment and the employment of plaintiff's female relatives, and such litigation can be initiated during an extended period of time.

124. Upon knowledge and belief, since such situations allowed the state actors, law enforcement or intelligence services professionals, or people engaging in conduct that may be considered as state action, to conceal their prior relations / affiliations or conceal their own malicious and discriminatory acts, such individuals supporting Deloitte deliberately wanted to take advantage of their positions or prior knowledge of situations, in order to create defense for themselves.

125. For example, Joanna Rohde worked with Deloitte Financial Services Partners as identified, and previously targeted the plaintiff using a similar pattern of recruitment tactics at JP Morgan Chase to shield the interests of Deloitte Financial Services Partners Jonston and Fernandez, and shield her personal collaboration with such Partners.

126. Upon knowledge and belief, since such situations allowed the state actors, law enforcement or intelligence services professionals, or people engaging in conduct that may be considered as state action, to conceal their prior relations / affiliations or conceal their own malicious and discriminatory acts, such individuals supporting Deloitte deliberately wanted to take advantage of their positions or prior knowledge of situations, in order to create defense for themselves.

127. Defendant Deloitte substantial procedural irregularities in the investigation of the sexual harassment allegation, including their failure (a) to seek out potential witnesses that the accuser Christina Young had identified as sources of information, (b) accuser Christina's inconsistent statements on the facts, (c) Deloitte's failure to comprehend the causal connection and malicious nexus between the December Holiday Party and the false sexual harassment allegation raised by Christina on January 11th for the January 10th 2018 event, (d) Deloitte's failure to act in accordance with company procedures designed to protect accused employees, and (e) Deloitte's arrival at conclusions such as the plaintiff was inebriated at multiple events without any fact checking or witness testimony – such actions were "incorrect and contrary to the weight of the evidence".

128. The procedural deficiencies in the Deloitte's investigation and adjudication of the sexual harassment complaint raise an inference that the Deloitte was motivated, at least in part, by sex bias. It is plausible that Deloitte was **motivated** to "favor the accusing female over the accused male" in order to **demonstrate its commitment to protecting female employees** from accused male employees. Upon knowledge and belief, after learning about plaintiff's job application at

Facebook, Defendant Deloitte HR communicated with Facebook HR and **exerted their influence** such that plaintiff would not be able to secure gainful alternate employment at Facebook.

129. Moreover, since Deloitte had access to plaintiff phone and electronic communications, Deloitte knew that the plaintiff was being interviewed by Facebook **around the same time** Deloitte was conducting an internal investigation on both the malicious sexual harassment allegation against the plaintiff, and the ethics and integrity complaint filed by the plaintiff.

130. The abrupt decision to not proceed with plaintiff's recruitment and interviews by Facebook on April 3rd 2018 suggests suggests that Facebook's decision on the issue was motivated, at least in part, by bias. Since the issue was not just a harassment issue, but a sexual harassment issue, **Facebook's decision was motivated by sex bias**. It is plausible that Facebook refused to hire the plaintiff because it was <u>motivated</u> to "favor non-accused female applicants and employees at Facebook over the accused male plaintiff" in order to **demonstrate its commitment to protecting female applicants** and employees from male sexual harassers.

131. After learning about Plaintiff's malicious sexual harassment allegation, defendant Deloitte consulting took multiple adverse actions against plaintiff, such as issuing him a malicious letter of reprimand, replacing him on a project with a White US national, Deloitte treated similarly situated employees differently than the plaintiff.

132. The clearly irregular investigative or adjudicative process, lack of information on the subject to the plaintiff, lack of communication on the issue to the plaintiff, followed by a constant drumbeat of ridicule, mocking and harassment both on and off projects provide an inference that Deloitte was motivated by sex-based bias.

133. The evidence substantially favored the plaintiff, but the Deloitte evaluator, Joanna Rohde, a Caucasian female, without an apparent reason based on the evidence, formed an opinion and/or a conclusion in favor of the female accuser. Thus, this further provides an inference that the evaluator has been influenced by gender bias.

134. The defendant Deloitte became aware of plaintiff's disability in December 2017, as informed by the plaintiff to the Deloitte Partner. In early January 2018, Christina filed her malicious

acquisitions, and other female supervisors maintained a discriminatory animus against the plaintiff.

135. The internal involvement of female Deloitte Human Resource (HR) Managers and their continued communication with plaintiff's female supervisors within this period suggest that defendant Deloitte Consulting formed an opinion or a conclusion – in favor of the female accuser and in-general to protect the interest of other females – and against the plaintiff. Thus, this further provides an inference that the female HR professionals and the plaintiff's female supervisors had been influenced by gender bias.

136. The defendant Deloitte has further concealed information on the protected characteristics or factor of plaintiff's female supervisors. Upon knowledge and belief, one of the female supervisors involved in plaintiff's case held protected characteristics or factors such as pregnancy. After the defendant formed an opinion and/or a conclusion in favor of the female sexual harassment accuser, and after the defendant discovered the existence of a female supervisor who was responsible to either provide or help identify a performance evaluation for the plaintiff, the defendant Deloitte knowingly and wantonly made sure that the plaintiff was assigned a false non-discriminatory reason for separation.

137. After learning about plaintiff's sexual harassment allegation in mid-January 2018, the defendant Deloitte decided to assign the plaintiff a non-discriminatory performance-based negative evaluation to maintain an illegal control of the plaintiff, and further concealed such information from the plaintiff to limit their liability. Female HR professions and supervisors internally communicated about the plaintiff, yet never informed the plaintiff of his negative performance evaluation until 6-months after such events.

138. On February 16th 2018, the defendant Deloitte issued a discriminatory, biased, false and malicious letter of reprimand to the plaintiff. After the plaintiff refuted the letter and provided witnesses to support his innocence, the defendant concocted a malicious plan to permanently assign a non-discriminatory performance-based reason for plaintiff's termination.

139. On February 16th 2018, the plaintiff provided evidence and witnesses that identified that plaintiff was sober and well behaved on the January 10th 2020 event. After the defendant Deloitte became

aware of this fact, the defendant knew that the malicious acquisition filed by Christina Young was false. This provided the defendant a further impetus to conceal material facts on the issue, and knowingly and wantonly provide the plaintiff with a permanent negative performance evaluation.

140. After the plaintiff produced witnesses, the defendant Deloitte employee Joanna Rohde knew that on January 11th 2018, Christina Young had made false allegations against the plaintiff for the January 10th 2018 event. Since Joanna coordinated internally to have the plaintiff released from the JP Morgan Chase project on December 18th 2021 (as identified previously), and because she created a false and malicious letter of reprimand, in order to save herself, the firm and the financial services partners from liability, she had no option but to corroborate with Christina Young. Both Christina and Joanna helped each other by having Christina provide inconsistent statements on the sexual harassment issue, and later Christina was moved as Chief of Staff to a Litigating firm upon knowledge & belief around the same time plaintiff filed his lawsuit in court.

141. Defendant Joanna Rohde acted in this manner in order to conceal defendant's direct involvement on the issues such as (a) FSI Partner's direct knowledge of plaintiff's disability / medical condition in Dec. 2017, (b) Joanna's involvement on plaintiff's release from the J.P Morgan Project the next business day of plaintiff's disability event, and (c) defendant's discrimination against the plaintiff on the basis of protected characteristics / factors of other female employees in 2018 specifically because of the existence of a pregnant woman. HR Joanna Rohde was aware of the situation and **actively participated** in retaliatory acts against the plaintiff such as the issuance of a malicious letter of reprimand, and plaintiff's release from the JP Morgan Chase and Fox News Projects.

142. In addition, the plaintiff was rolled off projects and was sent to projects for which he was not trained for (e.g. see Kaiser Permeante). Deloitte failed to train the plaintiff for positions on the basis of his gender and race, and Deloitte's past negative treatment of the plaintiff on the basis of his gender and race is relevant in showing that Deloitte's proffered reasons for an adverse action against the plaintiff were not true.

143. During this time, both Deloitte and Facebook knew that had Facebook allowed the plaintiff to continue through the interview process, given plaintiff's vast experience and knowledge, the

plaintiff would have secured a full-time position with Facebook. Hence, both Deloitte and Facebook intentionally and wantonly sought to mitigate their risks on the matter by denying the plaintiff employment at Facebook.

144. Upon information and belief, similarly situated recruitment candidates who did not suffer from gender-based employment discrimination on the basis of a malicious sexual harassment allegation at their previous employers, or on the basis of protected characteristics of a pregnant female supervisor by their previous employer, were considered for the full-time positions at Facebook. These recruitment candidates or applicants went through Facebook's recruitment process and were subsequently hired as full-time employees by Facebook. Similarly situated applicants were neither discriminated nor retaliated by the Facebook Recruiter on the basis of their gender.

145. For the years 2018-2023, Plaintiff and a similarly situated to Facebook female applicants, Kelly Lundy and Gabriella Blum. Both plaintiff and Kelly had almost the same number of years of work experience. The applicants were subjected to similar hiring standards, that screened for and required similar skill, effort, and responsibility for the similar position at Facebook.

146. Upon knowledge and belief, Kelly Lundy and Gabriella Blum worked on similar positions that required similar skill, effort, and job responsibilities at Facebook, which is comparable to plaintiff's Client Consulting work at Deloitte. Kelly Lundy and Gabriella Blum were subject to the same standards of fulltime employment discrimination laws at Facebook, as the plaintiff at Deloitte. These employees had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

147. For the years 2018-2023, Kelly Lundy and Gabriella Blum were hired by Facebook, however, the plaintiff was not. Upon knowledge and belief, Kelly Lundy and Gabriella Blum did not suffer from a malicious sexual harassment allegation at their previous employers, were not discriminated by their previous employers on the basis of protected characteristics of a pregnant female supervisor. Kelly and Gabriella also lacked plaintiff's diverse work experience dealing

with multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

148. Facebook singled out the plaintiff and treated the Plaintiff differently than similarly situated female applicants, Kelly Lundy and Gabriella Blum, applicants who did not suffer from gender discrimination in the form of sexual harassment allegation or protected female factor like pregnancy. Kelly and Gabriella were finally hired by Facebook as a fulltime employee while the plaintiff was not. At Deloitte, the plaintiff was not just confidentially accused of any harassment, the plaintiff was accused of sexual harassment which provide the minimal inference of sex bias.

149. Based on the involvement of Deloitte White Caucasian female HR Joanna Rohde, who continually engaged in conduct that otherwise may be considered as State Action and knew that the circumstances substantially favored the plaintiff, Facebook without an apparent rationale based on the evidence, formed an opinion and/or a conclusion in favor of the female accuser at Deloitte and in favor of the female employees at Facebook. Thus, the circumstances further provide an inference that Facebook's decision not to hire the plaintiff had been influenced by gender bias and meeting of finds with state actors at Deloitte.

150. The plaintiff was reached out by Facebook, and the plaintiff's profile was selected by the Facebook recruiter. The plaintiff was qualified for the position at all times. However, the Facebook recruiter, further showed bias by providing better treatment to white female recruitment applicants, like Kelly Lundy and Gabriella Blum, who were subsequently hired by Facebook. While plaintiff, a non-White Asian male applicant, was rejected by Facebook and his application was denied.

151. It can be inferred that through interactions or involvement of Deloitte State Actors, Facebook Recruiter knew about plaintiff's gender, race and national origin bias by Deloitte Consulting LLP, and the possibility of liabilities and extended litigation possibilities at Facebook.

152. The plaintiff's profile was selected by the Facebook recruiter. The plaintiff was qualified for the position at all times. However, the Facebook recruiter, further showed bias by continuing to seek applications for the multiple similar positions, including Product Strategist or Trust Strategist.

Facebook subsequently hired females like Kelly Lundy and Gabriella Blum. Upon knowledge and belief, other female candidates were continued to be hired for the same or similar positions at Facebook after the plaintiff's application was denied.

## III. Retaliation

### Retaliation by Deloitte

153. The plaintiff would like to incorporate by reference Paragraphs 181 to 213 from his complaint against Apple Inc., dated April 8th 2021, filed at the District Court of the Southern District of New York here (see case# 1:21-cv-03287-LTS, Doc# 1)

### Retaliation by Facebook

154. By filing an internal ethics and integrity complaint at Deloitte, the plaintiff engaged in a protected activity.

155. Deloitte knew that the plaintiff had a valid ethics and integrity complaint because Deloitte had assigned the plaintiff disproportionately heavy workload of two full-time employees to the plaintiff.

156. At all times were Deloitte and their talent relations professional Joanna Rohde aware of the risks associated with overlooking facts and evidence, or omitting or ignoring witness testimonies, identified on plaintiff's ethics complaint.

157. By overlooking facts and evidence, or omitting or ignoring witness testimonies, Deloitte supervisor Joanna Rohde violated Deloitte's internal processes or protocols.

158. Since Deloitte had access to plaintiff's phone communications, emails and messages, Joanna knew that during Deloitte's investigation of plaintiff's ethics and integrity complaint, the plaintiff was being interviewed by Facebook.

159. Joanna Rohde was aware of the inconsistent or incomplete investigation by Mr. Austin Perez, yet remained indifferent to the consequences of such discriminatory acts. At all times was Joanna aware of the risks associated with misrepresentation or misconduct by her subordinate, yet continued to overlook facts and intentionally misguide Mr. Perez.

160. Joanna Rohde displayed substantial departure from accepted professional judgment, practice, or standards on the issues raised by the plaintiff. Upon knowledge and belief, by basing her decision to protect the business needs and perceived business liabilities of both Deloitte and Facebook (as further explained below), Joanna violated plaintiff Federal and State protected rights.

161. Facebook recruiter Ernie Molleri selected plaintiff profile and reached out to the plaintiff. The plaintiff was qualified for the position at all times. However, since Deloitte had access to plaintiff's phone and email communications, and involved law enforcement or intelligence service state actors working as Deloitte talent relation professionals on plaintiff's investigations, given the business interests of both Facebook and Deloitte were at stake, the sequence of events provide an inference that Deloitte communicated with and coordinated with Facebook recruiter on plaintiff's recruitment.

162. Given the business interests of both Facebook and Deloitte were at stake, the involvement of a law enforcement official in light of the sequence that followed, provide an inference from the circumstances that the White State Actor working for Deloitte and Facebook recruiter had a 'meeting of the minds' and thus reached an understanding that plaintiff should be refused recruitment.

163. It can be further inferred that such understanding or agreement (express or tacit) was based in-part on plaintiff's disability, gender and race based discriminatory events at Deloitte, in-part on plaintiff's Whistle Blower retaliation ethics and integrity complaint, in-part on the existence of plaintiff's female relative working at Facebook, and in-part on State Actor Joanna's affiliations and relationships with government officials.

164. It can be inferred that in order to establish that the business interests of both Deloitte and Facebook were at stake, Facebook was informed or was made aware of the nature of

investigation or facts on plaintiff. Had Facebook not known about (a) malicious sexual harassment allegation by a White woman twice the age of plaintiff, (b) assignment of disproportionately heavy workload to the plaintiff, (c) invidious comments and racial discrimination by Supervisors, (d) plaintiff's disability, and/or (e) existence of plaintiff's female relatives as Facebook employee, one can infer that Facebook would not have refused to hire the plaintiff.

165. It can be inferred that both Facebook and Deloitte shared the **same intent or community of purpose** that had plaintiff been selected and recruited by Facebook, the Deloitte female supervisors who raised gender discrimination issues against the plaintiff or the Deloitte female/s with a protected characteristic or factors such as pregnancy may **entangle both Facebook and Deloitte into needless litigation** based on both plaintiff's employment and the employment of plaintiff's female relatives, and such litigation can be initiated during an extended period of time.

166. Upon knowledge and belief, since such situations allowed the state actors, law enforcement or intelligence services professionals, or people engaging in conduct that may be considered as state action, to conceal their prior relations / affiliations or conceal their own malicious and discriminatory acts, such individuals supporting Deloitte deliberately wanted to take advantage of their positions or prior knowledge of situations, in order to create defense for themselves.

167. After filing of plaintiff's ethics and integrity complaint, Deloitte coordinated and conferred with Dr. Niti's employer to allege false allegations to ensure that her position as a strong witness on plaintiff's case was negatively impacted. Since Deloitte knew that it had retaliated against both the plaintiff and Dr. Niti Aggarwal, and since the plaintiff provided proof of his disability / medical condition, Deloitte knew that the plaintiff had a valid claim against the firm based on both his disability / medical condition and the facts identified on his ethics complaint.

168. Facebook knew that had Facebook allowed the plaintiff to continue through the interview process, given plaintiff's vast experience and knowledge, the plaintiff would have secured a full-time position with Facebook. Hence, both Deloitte and Facebook intentionally and wantonly sought to mitigate their risks on the matter by denying the plaintiff employment at Facebook.

169. Facebook overlooked plaintiff's key skillsets like having experience with diverse clients in multiple industries, Product knowledge and background, etc. Defendant Facebook hired candidates who were less qualified than the plaintiff as they did not possess such skillsets. Defendant Facebook retaliated against the plaintiff by not hiring the plaintiff. Defendant Facebook hired employees who were outside of plaintiff's protected class.

170. As part of continuing violations by Deloitte, due to their targeted manipulation of plaintiff's internet, the plaintiff has experienced significant difficulties in determining similarly situated Facebook employees in all material aspects, who worked for Facebook during the same period of time, with similar or comparable skillsets, roles or job responsibilities, similar or comparable years of work experience or educational background as the plaintiff. The plaintiff has not been able to verify the real identity of such profiles, and believes some of the profiles received by the plaintiff on Linkedin were fake. This fact is supported by the fact that during the compilation of this complaint in October 2023, Deloitte also manipulated plaintiff's internet to send him fake news on Israel-Hamas war, World Leaders, Cricket and Financial markets.

171. For the years 2018-2023, Plaintiff was similarly situated to Facebook employees, Derek Richer. Both plaintiff and Mr. Richer had almost the same or comparable number of years of work experience. Mr. Richer worked on similar positions that required similar skill, effort, and job responsibilities at Facebook, which is comparable to plaintiff's Client Consulting work at Deloitte. Mr. Richer were subject to the same standards of fulltime employment discrimination laws at Facebook, as the plaintiff at Deloitte. Mr. Richer had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

172. The defendant Facebook as such singled out the plaintiff, treated him differently than similarly situated employees, like Derek Richer, who (a) did not have a pending employment lawsuit against them by their previous employer, who (b) did not suffer from serious allergy based medical condition / disability, who (c) were not discriminated by their previous employer or by Facebook on the basis of protected characteristics or factors of female employees, who (d) were not discriminated on the basis of a malicious sexual harassment allegation against them, and (e)

were not discriminated on the basis of their national origin or race. Such employees were not retaliated by Facebook, and went through the recruitment process and got hired.

173. For the years 2018-2023, the Plaintiff was similarly situated to Facebook applicants Ms. Varanjot Kaur, Mr. Uruthiramoorthy, etc. Upon knowledge and belief, these applicants were eligible to work for Facebook on the basis of their specialty worker H1B visa, same as the plaintiff. These applicants also had similar nationality as the plaintiff and were Indian Nationals. These employees had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

174. Plaintiff had the additional experience of representing himself and corporate America at different clients within the United States, however, upon knowledge and belief, applicants like Ms. Varanjot Kaur, Mr. Uruthiramoorthy lacked the experience the plaintiff had. Such applicants also lacked plaintiff's diverse work experience in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

175. Deloitte assigned the plaintiff disproportionately heavy workload of two full-time employees, and violated plaintiff's anti-discriminatory practices of the specialty worker Labor Condition Applications (LCA) governed by the Department of Labor (DOL). Thus, plaintiff was a member of a protected class.

176. Facebook singled out the plaintiff and treated the Plaintiff differently than similarly situated foreign national employees, like Ms. Varanjot Kaur, Mr. Uruthiramoorthy. Upon knowledge and belief, the previous employers of these Facebook Applicants like Ms. Varanjot Kaur, Mr. Uruthiramoorthy did not violate the anti-discriminatory practices of the specialty worker Labor Condition Applications (LCA) governed by the Department of Labor (DOL). These Facebook applicants were outside of plaintiff's protected class based on DOL LCA violations, were hired by Facebook for Fulltime roles, while the plaintiff was not hired.

## IV. Discrimination Based on National Origin & Race

## Discrimination by Deloitte based on Plaintiff's National Origin & Race

177. The plaintiff would like to incorporate by reference Paragraphs 224 to 277 from his complaint against Apple Inc., dated April 8th 2021, filed at the District Court of the Southern District of New York here (see case# 1:21-cv-03287-LTS, Doc# 1)

## Discrimination by Facebook based on Plaintiff's National Origin & Race

178. It can be inferred that both Facebook and Deloitte shared the **same intent or community of purpose** that had plaintiff been selected and recruited by Facebook, the Deloitte female supervisors who raised gender discrimination issues against the plaintiff or the Deloitte female/s with a protected characteristic or factors such as pregnancy may **entangle both Facebook and Deloitte into needless litigation** based on both plaintiff's employment and the employment of plaintiff's female relatives, and such litigation can be initiated during an extended period of time.

179. Upon knowledge and belief, since such situations allowed the state actors, law enforcement or intelligence services professionals, or people engaging in conduct that may be considered as state action, to conceal their prior relations / affiliations or conceal their own malicious and discriminatory acts, such individuals supporting Deloitte deliberately wanted to take advantage of their positions or prior knowledge of situations, in order to create defense for themselves.

180. For example, Joanna Rohde worked with White Deloitte Financial Services Partners as identified, and previously targeted the plaintiff using a similar pattern of recruitment tactics at JP Morgan Chase to shield the interests of White Deloitte Financial Services Partners Jonston and Fernandez, and shield her personal collaboration with such Partners.

181. Based on the above arguments, it can be inferred that the **White** law enforcement professional (See State Actor Austin Perez) employed by Deloitte and the Facebook recruiters had a 'meeting of the minds', and thus reached an understanding that plaintiff should be refused or denied recruitment opportunities at Facebook.

182. It can be further inferred that such understanding or agreement (express or tacit) was based in-part on plaintiff's disability, gender and race based discriminatory events at Deloitte, in-part on plaintiff's Whistle Blower retaliation ethics and integrity complaint, in-part on the existence of plaintiff's female relative working at Facebook, and in-part on State Actor Joanna's affiliations and relationships with government officials.

183. Facebook recruiter Ernie Molleri selected plaintiff profile and reached out to the plaintiff. The plaintiff was qualified for the position at all times. However, since Deloitte had access to plaintiff's phone and email communications, and involved law enforcement or intelligence service state actors working as Deloitte talent relation professionals on plaintiff's investigations, given the business interests of both Facebook and Deloitte were at stake, the sequence of events provide an inference that Deloitte communicated with and coordinated with Facebook recruiter on plaintiff's recruitment.

184. Given the business interests of both Facebook and Deloitte were at stake, the involvement of a law enforcement official in light of the sequence that followed, provide an inference from the circumstances that the White State Actor working for Deloitte and Facebook recruiter had a 'meeting of the minds' and thus reached an understanding that plaintiff should be refused recruitment.

185. The plaintiff has identified that White State Actor, Austin Perez, held racial animus against the plaintiff. The presence or involvement of the same White State Actor provides an inference that Facebook's decision not to hire the plaintiff was based in part on plaintiff's race.

186. Since defendant Facebook's decision to refuse to hire the plaintiff was based in part on plaintiff's race, it can be established that defendant Facebook's refusal to hire the plaintiff was not based on non-discriminatory terms.

187. It can be inferred that in order to establish that the business interests of both Deloitte and Facebook were at stake, Facebook was informed or was made aware of the nature of investigation and allegations such as a (a) malicious sexual harassment allegation by a White woman twice the age of plaintiff, (b) assignment of disproportionately heavy workload based on plaintiff's race and national origin, (c) invidious comments and racial discrimination by

Supervisors, (d) plaintiff's disability. Such investigation or allegation based on plaintiff's race and the presence of White State Actor are sufficient to establish that Facebook's refusal to hire the plaintiff was based in part on plaintiff's race.

188. Defendant Facebook Recruiters, Ernie Molleri, was a US Citizen or National and worked as a recruiter at Facebook. Upon knowledge and belief, he was supported by another female US Citizen or National named Rosslee Mamis.

189. The fact that Facebook employee Ernie Molleri reached out to the plaintiff for recruitment on February 28th 2018, interacted with the plaintiff and proposed plaintiff's profile to the hiring team, and later communicated with the plaintiff that Facebook did not intent to move forward with plaintiff's recruitment on April 3rd 2018, suggests that he had supervisory oversight over plaintiff's recruitment. His supervisory oversight suggests that they had input in the final decision of Facebook's refusal to hire the plaintiff.

190. Since Facebook knew that the plaintiff would require visa sponsorship for his full-time employment at Facebook, it can be inferred that the Facebook recruiter or hiring team must have considered plaintiff's national origin as a factor in their decision not to hire the plaintiff

191. Moreover, since Deloitte employee Joanna Rohde knew that plaintiff's female relatives with government affiliations either worked for Deloitte or Facebook, and since Joanna had past relationships or affiliations with members of the intelligence service community, including former Indian leader Mr. Musk, it can be established that Facebook and Deloitte shared intent or community of purpose to limit their liabilities, and such intent were based in-part on plaintiff's National Origin

192. By engaging with one or more state actors as part of Deloitte talent relations team, or by engaging in actions to protect the privacy or security of current or former State Actors and their families, Joanna engaged in conduct that otherwise may be considered as State Action

193. Since defendant Facebook's decision to refuse to hire the plaintiff was based in part on plaintiff's National Origin, it can be established that defendant Facebook's refusal to hire the plaintiff was

not based on non-discriminatory terms. That is, Plaintiff's national origin was in part a limiting factor on their decision not to offer equal employment opportunity to the plaintiff.

194. Given the business interests of both Facebook and Deloitte were based in-part on plaintiff's national origin, the involvement of a law enforcement official in light of the sequence that followed, provide an inference from the circumstances that the White State Actor working for Deloitte and Facebook recruiter had a 'meeting of the minds' and thus reached an understanding that plaintiff should be refused recruitment.

195. During the compilation of this complaint in October 2023, Deloitte also manipulated plaintiff's internet to send him fake news on Israel-Hamas war, World Leaders, Cricket and Financial markets, etc. For example, on or around October 25th 2023, the plaintiff received a news on the health of Russian President. In February 2023, the plaintiff travelled to Delhi to partially watch a cricket test match live. Since then, Deloitte has targeted the plaintiff with fake news on cricket. Such fake news has constantly been pushed to the plaintiff by Deloitte.

196. Such acts provide and have been a part of continuing violations by Deloitte. In addition, due to their targeted manipulation of plaintiff's internet, the plaintiff has experienced significant difficulties in determining similarly situated Facebook employees in all material aspects, who worked for Facebook during the same period of time, with similar or comparable skillsets, roles or job responsibilities, similar or comparable years of work experience or educational background as the plaintiff.

197. For the years 2018-2023, Plaintiff was similarly situated to Facebook White female employees, Kelly Lundy and Camila Vieira. Both plaintiff, Kelly and Camila Vieira had almost the same or comparable number of years of work experience. Kelly and Camila worked on similar positions that required similar skill, effort, and job responsibilities at Facebook, which is comparable to plaintiff's Client Consulting work at Deloitte. Kelly and Camila were subject to the same standards of fulltime employment discrimination laws at Facebook, as the plaintiff at Deloitte. These employees had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

198. For the years 2018-2023, Kelly Lundy was internally promoted by Facebook for similar positions, and Camila Vieira was hired for similar position that the plaintiff applied to, however, the plaintiff was not hired. Upon knowledge and belief, Kelly and Gabriella did not suffer from a malicious sexual harassment allegation at Facebook, were not discriminated by Facebook on the basis of protected characteristics of a pregnant female supervisor or their race. Kelly and Gabriella lacked plaintiff's diverse work experience dealing with several multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

199. Facebook singled out the plaintiff and treated the Plaintiff differently than similarly situated White female employees, Kelly Lundy and Camila Vieira, who did not suffer from **gender discrimination** by their previous employer or by Facebook in the form of sexual harassment allegation or **protected female factor** like pregnancy, or were not discriminated at Facebook based on their **race**. Kelly Lundy and Camila Vieira, full-time Facebook employees who were **outside of plaintiff's protected gender and race class**, were hired and/or internally promoted by Facebook for similar positions that the plaintiff was not hired for.

200. Similarly, Defendant Facebook's similarly situated applicants, like Kelly Lundy and Camila Vieira, who were **U.S Nationals and/or U.S Permanent residents**, did not have to go through the ordeal of having their employment application at Facebook denied. Plaintiff was qualified for an available position at Facebook, was rejected by Facebook, and after plaintiff's rejection Facebook hired a White applicants Kelly Lundy and Camila Vieira as employees. Defendant Facebook's actions suggest that **White US National Female applicants** and employees were given preference over the Non-White Foreign National Male plaintiff.

201. Defendant Facebook's similarly situated applicants, like Ms. Varanjot Kaur, Mr. Uruthiramoorthy, who were foreign workers and later hired by Facebook as employees, comparable to the plaintiff on having a **H1b work visa,** did not have to go through the ordeal of having their Facebook application denied after being selected by the Facebook recruiter. Plaintiff was singled out against similarly situated foreign workers, who did indulge in **protected activities** at their employer, who did not have a false and malicious sexual harassment allegation by a woman twice their age.

202. In fact, **US National employees** were hired after Facebook rejected the plaintiff. Upon knowledge and belief, Kelly Lundy, Camila Vieira, Robert C, or Krystal Briggs were hired after the plaintiff was rejected. Plaintiff was singled out against similarly situated US Nations and Permanent residents, who did not have a filed Federal employment lawsuit against their previous employer based on race and/or national origin in a Federal court.

203. In fact, plaintiff was **more qualified** than similarly situated White employees Stephen Largen, Blake H., etc. The applicants were hired for similar position/s after Facebook started their recruitment process with the plaintiff. Plaintiff had more experience in terms of diverse Client Consulting Experience in different industries over 8+ years that gave him an added advantage as an applicant. Such actions show that Facebook was unwilling to provide non-discriminatory employment opportunity as a fulltime employee to the plaintiff

204. The defendant Facebook terminated plaintiff's application by providing no substantive legitimate reasons for denial or failure to hire. Upon knowledge & belief, Facebook knowingly misjudged and disregarded plaintiff's job qualifications, and plaintiff was not able to enjoy the same employment privileges as offered to White employees or US Nationals.

## CAUSE OF ACTION

## COUNT ONE

**(Against Defendant Facebook and Deloitte Consulting LLP)**

**Discrimination based on Disability / Medical Condition**

*[in violation of Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq, and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

205. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206. Plaintiff reported his disability / medical condition to the Facebook recruiter. Because of Plaintiff's disability / medical condition, plaintiff belongs to a group of persons that Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq. and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq. intended to protect against discrimination in the terms and conditions of employment.

207. By the above-described acts, Defendant Facebook discriminated against plaintiff because of his disability, by refusing to hire him for a fulltime position. Facebook coordinated with Deloitte and discriminated against Plaintiff with respect to terms, conditions and privileges of his employment because of his disability, through denial of his employment rights and benefits, and future promotions and achievements, by refusing to hire him, all in violation of Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.)

208. Further, Defendants Facebook & Deloitte acted with indifference to both state & federally protected rights of the Plaintiff. At all relevant times, Plaintiff was qualified for his position with Defendant Facebook.

209. Facebook recruiter and Deloitte State actor had a meeting of mind to reach an understanding not to hire the plaintiff. Thus, it can be inferred that Facebook recruiter was aware of plaintiff's disability / medical condition.

210. Plaintiff was treated differently than others outside his protected class, and he suffered discrimination because of his disability / medical condition.

211. Because of Defendants' discriminatory actions, Plaintiff has suffered adverse employment actions in the form of failure to hire. Plaintiff has suffered an inability to earn a living at Facebook and the unjust refusal to be hired.

212. Plaintiff also suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future.

**COUNT TWO**

**(Against Defendant Facebook and Deloitte Consulting LLP)**

**Discrimination based on Disability / Medical Condition**

*[in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.]*

213. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

214. Plaintiff was treated less well by defendant Facebook than similarly situated applicants and/or employees based on his disability / medical condition

215. As mentioned above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. intended to protect against discrimination in the terms and conditions of employment. Defendant Facebook coordinated with Deloitte to deny the plaintiff an employment opportunity.

216. By the above-described acts, defendant Facebook is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.

217. Further, Defendants Facebook & Deloitte acted with reckless indifference to federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

**COUNT THREE**

**(Against Defendant Facebook and Deloitte Consulting LLP)**

**Discrimination based on Gender**

*[in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq, and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

218. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

219. Because Plaintiff was subjected to false & malicious sexual harassment allegations against him at Deloitte Consulting LLP, he belongs to a group of persons that Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq. and New York State Human Rights Law intended to protect against discrimination in the terms and conditions of employment.

220. By the above-described acts, defendant Facebook discriminated against plaintiff's gender because of the false and malicious sexual harassment allegations at Deloitte, by subjecting him to different treatment than other applicants, by tolerating and failing to take affirmative action to correct these unlawful employment practices, by discriminating against Plaintiff with respect to terms, conditions and privileges of his employment because of his gender, through denial of his employment rights and benefits, promotions and achievement, and by refusing to hire him as an employee, all in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq, and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.

221. Facebook recruiter and Deloitte State actor had a meeting of mind to reach an understanding not to hire the plaintiff. Thus, it can be inferred that Facebook recruiter was aware of plaintiff's gender discrimination claims or the involvement of females with protected characteristics.

222. Defendant Deloitte followed a clearly irregular investigative or adjudicative process, and plaintiff's employment at Facebook was denied during this irregular investigative or adjudicative process.

223. Here, Defendant Facebook took an adverse employment action against plaintiff, (a) in response to allegations of sexual misconduct at Deloitte, and/or (b) in response to a possibility of extended litigation because of the existence of plaintiff's relative female as a Facebook employee. Facebook new that because of such issues, the plaintiff belonged to a protected group.

224. The defendant Facebook provided more favorable treatment to employees not in plaintiff's protected group. Defendant Facebook abandoned promised procedural protections under the law to the plaintiff. These circumstances support a case of sex discrimination.

225. Further, Defendants Facebook & Deloitte acted with reckless indifference to both state & federally protected rights of the Plaintiff.

226. At all relevant times, Plaintiff was qualified for his role / application for full time position with Defendant Facebook, and his job performance was very good. Plaintiff was treated differently than others outside his protected class, and he suffered discrimination because of his gender.

227. Deloitte coordinated with Facebook, and Facebook treated similarly situated female employees better than the plaintiff. Facebook was informed or was aware that Deloitte Consulting llp, Female HR professionals falsified plaintiff's performance report. Plaintiff was released from multiple projects by his female HR or female supervisors with discriminatory bias. Female HR falsified plaintiff's personnel file and incorrectly mentioned that plaintiff has issues with women, and women in supervisory position, in spite of several recommendations from women. Plaintiff's new project / staffing availability was limited by his female staffing resource manager.

228. Defendant Facebook knew about plaintiff's allegations against Deloitte and his pending employment lawsuit. Defendant Facebook refused to hire the plaintiff, and maintained a discriminatory bias against the plaintiff on the basis of his gender. Because of defendant Facebook's discriminatory actions, Plaintiff has suffered adverse employment actions, including his inability to earn a living at Facebook and the unjust refusal to be hired.

229. Plaintiff also suffered loss of past and future wages, as well as emotional distress, mental anguish, pain & suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future.

**COUNT FOUR**

**(Against Defendant Facebook and Deloitte Consulting LLP)**

**Discrimination based on Gender**

*[in violation of New York City Human Rights Law (NYCHRL),*

*N.Y City Admin Code § 8-101 et seq., Stop Sexual Harassment in NYC Act]*

230. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

231. Plaintiff was treated less well by defendant Facebook than similarly situated applicants and/or employees based on his gender. Defendant Deloitte coordinated with Facebook to deny the plaintiff an employment opportunity.

232. As mentioned above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq., and Stop Sexual harassment in NYC Act intended to protect against discrimination in the terms and conditions of employment.

233. By the above-described acts, defendant is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. & Stop Sexual harassment in NYC Act

234. Further, Defendants Facebook & Deloitte acted with reckless indifference to federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

## COUNT FIVE

**(Against Defendant Facebook and Deloitte Consulting LLP)**

**Discrimination based on National Origin & Race**

*[in violation of 42 U.S.C 1981,*

*Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq,*

*New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

235. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

236. Plaintiff is a male of Indian nationality and is an Asian. Because of Plaintiff's national origin and race, he belongs to a group of persons that 42 U.S.C. § 1981, 42 U.S.C. § 2000e, et seq. (Title VII of the 1964 Civil Rights Act, as amended), and/or New York City Human Rights Law intended to protect against discrimination in the terms and conditions of employment.

237. By the above-described acts, Defendant Facebook discriminated against plaintiff because of his national origin and race, by refusing to hire the plaintiff on the basis of his race. In fact, by refusing to hire the plaintiff, defendant Facebook knowing impaired plaintiff's right for equal employment opportunity as a fulltime employee enjoyed by similarly situated White US Citizen (same as the right to make employment contract). (Note: Failure to hire on the basis of race is the same as not offering an employment contract, actionable under 42 USC § 1981)

238. Facebook's refusal to hire the plaintiff based on his race was a discriminatory conduct under 42 USC 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.". US Supreme Court has held that § 1981 "prohibits racial discrimination in the making and enforcement of private contracts". Based on the precedence by the US Supreme Court Plaintiff's claim is actionable under **Title VII** as a "refus[al] to hire" based on race, 42 U. S. C. § 2000e-2(a), and under **42 USC § 1981** as an impairment of "the same right . . . to make . . . contracts . . . as . . . white citizens," 42 U. S. C. § 1981

239. Deloitte violated 42 U.S.C. § 2000e-2(a)(1) (1982) which protects employees when an employer acts unlawfully, when employer discharges or discriminates against any individual on the basis of race, color, religion, sex, or national origin. Facebook's Refusal to hire based on race (same refusal enter into a non-discriminatory employment contract at the initial formation) is actionable under 42 USC 2000e-2(a).

240. Facebook recruiter and Deloitte State actor had a meeting of mind to reach an understanding not to hire the plaintiff. Thus, it can be inferred that Facebook recruiter was aware of the involvement and influence of White State Actors, and race-based discrimination faced by the plaintiff at Deloitte.

241. Facebook was not only unwilling to hire the plaintiff (same as enter into a nondiscriminatory employment contact with the plaintiff), Facebook refused to hire the plaintiff on racially neutral terms.

242. Facebook knew that Deloitte had failed to take affirmative action to correct their unlawful employment practices. In order to protect their self-interests, Facebook discriminated against the Plaintiff with respect to terms, conditions and privileges of his employment because of his national origin and race, through denial of his employment rights and benefits, promotions and achievement, and by failure to hire the plaintiff, all in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000e, et seq. (Title VII of the 1964 Civil Rights Act as amended) and/or New York City Human Rights Law

243. Further, Defendants Facebook & Deloitte has acted with malice, in the alternative, with reckless indifference to the federally and statewide protected rights of the Plaintiff.

244. It can be inferred that if the plaintiff did not have malicious sexual harassment allegations made by a 62-year old White female employee, defendant Facebook's recruiter would have eliminated the possibility of prolonged litigation risk against Facebook and not discriminated against the plaintiff on the basis of his race. In such a scenario, Facebook would have continued its recruitment process with the plaintiff and plaintiff would likely have been hired for the position.

245. Plaintiff was treated differently than similarly situated White employees, and the timing, sequence and causal connection of these events suggest that but for defendant Facebook's unlawful conduct based on plaintiff's national origin and race, plaintiff's failure to hire would not have occurred.

246. At all relevant times, Plaintiff was qualified for his position with Defendant Facebook. The Plaintiff was treated differently than other applicants or employees outside of his protected class, and plaintiff suffered discrimination because of his national origin and race.

247. It can be inferred that defendant Facebook knew about plaintiff's ethics and integrity complaint, and that Deloitte provided more favorable treatment to employees not in the protected group as identified above. Defendant Deloitte followed a clearly irregular

investigative or adjudicative process, and plaintiff's employment at Facebook was denied during this irregular investigative or adjudicative process. As identified, the sequence and timing of events leading up to Deloitte's inconsistent investigation, occurred under circumstances giving rise to an inference of discrimination on the basis national origin and race.

248. Defendant Facebook maintained a discriminatory animus against the plaintiff by not hiring the plaintiff and by hiring less qualified White employees.

249. Defendant Facebook treated similarly situated White US based applicants and/or employees better than the plaintiff.

250. Facebook knew that plaintiff's female relatives with government affiliations either worked for Deloitte or Facebook. Given their concern to protect the privacy or security of family members of current or former State Actors and their affiliations, it can be established that Facebook and Deloitte shared intent or community of purpose to limit their liabilities, and such intent was based in-part on plaintiff's National Origin. That is, Plaintiff's national origin was in part a limiting factor on their decision not to offer equal employment opportunity to the plaintiff.

251. Given the business interests of both Facebook and Deloitte were based in-part on plaintiff's national origin, the involvement of a law enforcement official in light of the sequence that followed, provide an inference from the circumstances that the White State Actor working for Deloitte and Facebook recruiter had a 'meeting of the minds' and thus reached an understanding that plaintiff should be refused recruitment.

252. Because of Defendant Facebook's discriminatory actions, Plaintiff has suffered adverse employment action, including his inability to earn a living at Facebook Inc. and the unjust termination of his employment application.

253. As a result of Defendant Facebook's discriminatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future

254. Further, Defendants Facebook & Deloitte acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendant Facebook's conduct, Plaintiff is also entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

**COUNT SIX**

**(Against Defendant Facebook and Deloitte Consulting LLP)**

**Discrimination based on National Origin & Race**

*[in violation of New York City Human Rights Law (NYCHRL),*

*N.Y City Admin Code § 8-101 et seq.]*

255. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

256. Plaintiff was treated less well at defendant Facebook than similarly situated applicants and/or employees based on his national origin & race. Defendant Deloitte coordinated with Facebook to deny the plaintiff an employment opportunity.

257. As identified above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. intended to protect against discrimination in the terms and conditions of employment.

258. By the above-described acts, defendant is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.

259. Further, Defendants Facebook & Deloitte acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is entitled to an award of compensatory & punitive damages in an amount to be further determined at trial.

**COUNT SEVEN**

**(Against Defendant Facebook and Deloitte Consulting LLP)**

**RETALIATION**

*[in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq, Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq, New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

260. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

261. 42 U.S.C. § 2000e-3(a) of the Civil Rights Act of 1964 protects employees against retaliation by their employer. In addition, Americans with Disabilities Act (ADA) (42. U.S.C § 12101) also protects employees against retaliation by their employer.

262. Defendant Facebook knew that plaintiff had filed an ethics and integrity complaint at Deloitte, and thus engaged in a protected activity.

263. Facebook knew about Deloitte's providing more favorable treatment to employees not in plaintiff's protected group. The White State Actor working for Deloitte and Facebook recruiter had a 'meeting of the minds' and thus reached an understanding that plaintiff should be refused recruitment.

264. The sequence and timing of events leading up to plaintiff's recruitment at Facebook, indicate that Facebook's refusal to hire the plaintiff occurred under circumstances giving rise to an inference of discrimination on the basis of intertwined factors based on plaintiff's disability, gender and national origin and race.

265. Defendant Facebook knew that in accordance with Deloitte Consulting's employee policy, Plaintiff had exposed misrepresentations by his supervisors where Plaintiff was given disproportionately heavy workload because of his race, and was threatened with termination. Defendant Facebook knew that Plaintiff engaged in a Protected Activity at Deloitte.

266. Defendant Facebook hired applicants or similarly situated applicants as fulltime employees

who were outside of plaintiff's protected class

267. Defendant Facebook hired applicants or similarly situated applicants as fulltime employees who were less qualified than the plaintiff

268. Defendant Facebook treated the plaintiff differently and less well than similarly situated US national and White employees based on his protected class, or national origin and race.

269. Had plaintiff's Facebook recruiter not know about plaintiff's relative working at Facebook and the concern for their privacy, and had the plaintiff not filed an ethics complaint at Deloitte with facts such as the assignment of disproportionately heavy workload, Facebook would not have denied plaintiff's employment application, and thus, the plaintiff would not have suffered an adverse employment action at Facebook.

270. Defendant Facebook retaliated against the plaintiff with motive, and deliberately refused the plaintiff an opportunity to progress on his hiring process and interviews. Facebook refused to hire the plaintiff in spite of him being qualified for the position at all times and liked by the recruiter.

271. Defendant Facebook's discriminatory practices were a motivating factor in plaintiff's refusal to hire. The defendant was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff. The timing, sequence and causal connection of these events suggest that but for defendant's discriminatory and unlawful conduct, plaintiff's refusal to hire would not have occurred. Plaintiff's failure to get hired would not have occurred in the absence of the above-mentioned retaliatory motives.

272. As a result of retaliatory action by Facebook, plaintiff was not only unjustifiably removed from the hiring process, but also denied full time employment opportunities, and potential loss of material benefits such as customary bonus and health benefits.

273. Defendant Facebook's coordination with Deloitte and actions constitute unlawful retaliation for which the Plaintiff has suffered damages. As such, Plaintiff seeks damages on this Cause

of Action including back pay, front pay, compensatory damages, punitive damages, pain and suffering, and attorney's fee in an amount to be determined at trial, but in no event less than $1,000,000.00.

**COUNT EIGHT**

**(Against Defendant Facebook and Deloitte Consulting LLP)**

**RETALIATION**

*[in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.]*

274. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

275. New York City Human Rights Law (NYCHRL) protects employees against retaliation by their employer.

276. Defendant Deloitte coordinated with Facebook to deny the plaintiff an employment opportunity.

277. Defendant Facebook's actions such as collaboration or meeting of minds with Deloitte were a "motivating factor" in defendant's refusal to hire the plaintiff. Since Facebook failed to provide any reason or explanation not to hire the plaintiff, Facebook knew that actions could deter a reasonable person like the plaintiff from engaging in protected activity.

278. The circumstances defined above were sufficient to prove retaliation based on a protected activity. Defendants' harassment and ill-treatment of Plaintiff violates New York City Human Rights Law (NYCHRL), for which Plaintiff request compensatory and punitive damages.

**COUNT NINE**

**(Against Defendant Facebook)**

**NEGLIGENCE**

*[in violation of New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq., New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.]*

279. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

280. Defendant Facebook's hiring team had a had a 'meeting of the minds' with the White State Actor working for Deloitte, and thus reached an understanding that plaintiff should be refused recruitment.

281. It can be inferred that Facebook was made aware of plaintiff's disability / medical condition, yet did not train, supervise or request their own employees or recruiters not to act without standard of care toward the plaintiff. Defendant recruiters discriminated against the plaintiff based on his disability / medical condition, race and gender by delaying and denying plaintiff's application.

282. Defendant facilitated the discrimination and retaliation suffered by the plaintiff by the negligence of its employees or recruiters, including negligent supervision as a result of unsound judgment and/or negligent hiring practices.

283. By not letting the plaintiff proceed though the next round of interviews and the hiring process, the defendant Facebook, in violation of their own policies and procedures, released the plaintiff into a "foreseeably uncertain setting" partly of their own making and thereby breached their duty of care.

284. By denying plaintiff career enhancement and development opportunities as a result of fulltime employment at Facebook, the defendant Facebook, in violation of their own policies and procedures, released the plaintiff into a "foreseeably uncertain setting" partly of their own making and thereby breached their duty of care.

285. Defendant employees were required to act with standard of care toward the plaintiff, however, they breached their duty by denying plaintiff's employment after they had a meeting of minds with Deloitte.

286. Defendant Facebook knew about plaintiff's disability / medical condition and gender

discrimination claims; however, they still did not stop their recruiter from failing to perform her duties like matching plaintiff's profile with other open roles, scheduling interviews etc.

287. Defendant knew or should have known that plaintiff had made an ethics and integrity discrimination complaint against Deloitte, however, did not train, supervise or request their own employees not to act without standard of care toward the plaintiff. Defendant Facebook knew about a plaintiff's race, ethnicity and national origin; however, they still failed to stop their recruiter from maintaining bias against the plaintiff.

288. Plaintiff concludes that defendant Facebook failed to, in good faith, take measures which were both feasible and reasonable under the circumstances.

**COUNT TEN**

**(Against Defendants Facebook and Deloitte Consulting LLP)**

**NEW YORK STATE LABOR LAWS**

*[in violation of New York State Human Rights Law (NYSHRL),*

*N.Y Exec Law § 290 et seq.,*

*N.Y Labor Law § 215]*

289. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

290. Plaintiff was not hired by Facebook in April 2018, and thus plaintiff faced an adverse employment action.

291. The plaintiff engaged in a protected activity at Deloitte by filing an ethics and integrity complaint. Facebook knew that New York Human Rights Law and New York Labor Law § 215 provides protection to employees against retaliation for exercising their rights under labor laws

292. After Deloitte became aware of plaintiff's disability, gender discrimination allegations, existence of plaintiff's female relative at Facebook with government affiliations and privacy requirements,

Deloitte had vested interest in not allowing the plaintiff to secure an alternate employment at Facebook.

293. Upon knowledge & belief, Deloitte made sure the Plaintiff could not secure alternate employment by coordinating with and conferring with the Human Resource or Recruiting department of defendant Facebook.

294. Deloitte has maintained a surveillance on the plaintiff's communications and devices and appear to have tracked plaintiff's phone conversation with Facebook, and interjected and disrupted plaintiff's recruitment at Facebook. Plaintiff also alleges that he ultimately was not hired by Facebook, which undisputedly can constitute actionable retaliatory conduct under New York statutes.

295. In a continued effort to maintain a control on the plaintiff, Plaintiff's alleges that defendant Deloitte sought to damage plaintiff's ability to earn a living by gaining access to plaintiff's recruitment information at Facebook.

296. Facebook Recruiter did not provide any substantive reasons for his refusal to hire the plaintiff.

297. Since Deloitte coordinated with Dr. Niti Aggarwal's employer to discriminate and retaliate against her, such improper acts by Facebook raise questions on the motive of both Deloitte and Facebook. Upon knowledge and belief, Deloitte maintained an illegal control over the plaintiff by retaliating against friends or family members. Such retaliation was practiced by coordinating with or conferring with the human resource professionals of other firms.

298. Facebook knew that Leaders who retaliated against the plaintiff at Deloitte had a higher propensity of targeting plaintiff's female relative working at Facebook, to generate a direct inference on gender discrimination. Based on the allegations, it can be inferred that Facebook had a "vested interest" in ensuring that such Deloitte employees were prevented from asserting anti-retaliation provisions under New York Laws.

299. Defendant Facebook knew that plaintiff was a minority employee of Indian origin who would be working for Facebook on H-1B visa. The plaintiff was treated differently than similarly situated White US based applicants. Such White US based applicants who had comparative less

qualifications than the plaintiff, were not only selected for interviews but also hired by Facebook. Thus, Facebook showed racial and national origin bias by hiring White US based applicants who were less qualified than the plaintiff.

300. In addition, the plaintiff was treated differently than similarly situated applicants based on his gender. Upon knowledge and belief, Female applicants were given a preference by Facebook, and were hired by Facebook. Facebook knowingly misjudged and disregarded plaintiff's job qualifications. After Facebook rejected the plaintiff, Facebook continued to seek Female applicants. White Female applicants who were less qualified than the plaintiff, were ultimately hired. Thus, Facebook showed gender-based bias by hiring less qualified Female applicants.

**<u>COUNT ELEVEN</u>**

**(Against Defendants Facebook and Deloitte Consulting LLP)**

**NEW YORK CITY LABOR LAWS**

*[in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.]*

301. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

302. As identified above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. intended to protect against discrimination in the terms and conditions of employment or hiring. In addition, New York City Human Rights Law (NYCHRL) protects employees against retaliation by their employer.

303. Plaintiff was treated less well at defendant Facebook than similarly situated applicants and/or employees based on his national origin & race

304. By the above-described acts, defendant is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.

305. Defendant Facebook's actions such as collaboration or meeting of minds with Deloitte State

Actor were a "motivating factor" in defendant's refusal to hire the plaintiff. Since Facebook failed to provide any reason or explanation not to hire the plaintiff, Facebook knew that actions could deter a reasonable person like the plaintiff from engaging in protected activity.

306. Defendants' harassment and ill-treatment of Plaintiff violates Plaintiff's Rights under the New York Labor Law, for which Plaintiff requests compensatory and punitive damages. Similarly, Defendants' discriminatory acts, harassment and ill-treatment of Plaintiff violates similar labor Laws under New York State Human Rights Law (NYSHRL), and New York City Human Rights Law (NYCHRL) for which Plaintiff requests compensatory damages. Also, a result of the Defendant's conduct, Plaintiff has suffered monetary damages, pain and suffering and emotional distress. As such, Plaintiff seeks damages, including attorneys' fees, for this Cause of Action in an amount to be determined at trial, but in no event less than $1,000,000.00.

**COUNT TWELVE**

**(Against Defendants Facebook and Deloitte Consulting LLP)**

**AIDER AND ABETTOR**

*[in violation of New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.), New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.)]*

307. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

308. On his ethics and integrity complaint, the Plaintiff cited the assignment of disproportionately heavy workload, and misconduct by Supervisors.

309. After Deloitte learned about plaintiff's disability / medical condition, and his ethics complaint, Deloitte Human Resource Resources Professionals aid and abetted the discriminatory conduct of Deloitte Leaders and Supervisors

310. Based on the arguments identified on this complaint, it can be inferred that by preventing the plaintiff from securing alternate visa-sponsored employment at Facebook, both Deloitte and

Facebook acted with "**community of purpose**" to shelter themselves from liabilities and extended litigation possibilities. Defendants Facebook & Deloitte coordinated with each other.

311. Given that Facebook employed plaintiff's female relative with government affiliation, and Deloitte employed or used a State Actor on the issue, **Facebook shared the intent or purpose** of the principal actor/s "Deloitte" or "Joanna Rohde" that the plaintiff be denied employment opportunities.

312. It can be inferred that both Facebook and Deloitte shared the **same intent or community of purpose** that had plaintiff been selected and recruited by Facebook, the Deloitte female supervisors who raised gender discrimination issues against the plaintiff or the Deloitte female/s with a protected characteristic or factors such as pregnancy may **entangle both Facebook and Deloitte into needless litigation** based on both plaintiff's employment and the employment of plaintiff's female relatives, and such litigation can be initiated during an extended period of time.

313. Given that Deloitte had targeted and discriminated against Dr. Niti Aggarwal, it can be further inferred that Facebook knew that Leaders who retaliated against the plaintiff at Deloitte had a higher propensity of targeting plaintiff's female relative working at Facebook, to generate a direct inference on gender discrimination and protect their personal interests. Based on the allegations, it can be inferred that Facebook had a "vested interest" in ensuring that certain Deloitte employees were prevented from asserting anti-retaliation provisions under New York Laws.

314. On his employment lawsuit, the Plaintiff has already stated that the defendant Deloitte Human Resource manager Joanna Rohde acted under the color of law to conceal information about the malicious sexual harassment allegation against the plaintiff. Joanna Rohde knew about the protected characteristics of one or more female employees.

315. Joanna Rohde conducted an incomplete and inconsistent investigation on the sexual harassment and ethics issues. Plaintiff was knowingly assigned a negative performance rating after Deloitte employees became aware of plaintiff's disability and sexual harassment allegation. Thus, defendant Deloitte created a policy or custom under which unconstitutional practices occurred, like giving negative performance rating on his projects in spite of his good

performance thereby falsely engineering a non-discriminatory reason for plaintiff's termination

316. Based on the suspicious timings and the sequence of the events, one can easily deduce that, Deloitte female supervisors and employees coordinated internally, aided and abetted each other, falsely engineered plaintiff's performance rating, thereby schemed to illegally control the Plaintiff, blocked his customary bonus, pay-raise and/or his promotion to the next level. The defendant Deloitte and HR Joanna Rohde were not only grossly negligent in managing the plaintiff's case, they acted with reckless intent against the plaintiff.

317. Defendant Deloitte continued to maintain policy or custom under which unconstitutional practices occurred, for example, supervisors maintained a discriminatory bias against him, and plaintiff was mocked or harassed on each and every project while similarly situated employees were not. These incidents were more than episodic; they were sufficiently concerted and continuous to be deemed pervasive.

318. Plaintiff alleges that the defendant Human Resource manager Joanna Rohde acted under the "color of law" and "actively supported" her colleagues in plaintiff's release from projects, engineered his negative performance evaluation and other adverse employment actions against him. Plaintiff also states that Joanna's decision was tainted by discrimination based on gender stereotypes, and plaintiff was treated differently than similarly situated employees.

319. Plaintiff has further indicated a connection between defendant Facebook and Deloitte, and that Facebook recruiter had a meeting of minds with the Deloitte State Actor to deny him employment opportunity. Deloitte actively participated in discriminatory conduct against the plaintiff.

320. Under the doctrine of vicarious liability, Deloitte remained liable for the discriminatory conduct of its employees, including employed State Actors. In this case, the alleged discriminatory conduct of Deloitte and its employees was specifically targeted towards the plaintiff, such that the plaintiff would not be allowed or enabled to secure a fulltime job at Facebook.

321. As identified on this complaint, Discriminatory practices of senior policy making officials at Deloitte was so persistent or widespread as to constitute a "*custom or usage under law*", while discriminatory practices of subordinate employees at Deloitte were so manifest as to imply the constructive acquiescence of senior policy makers. Therefore, we can safely deduce and imply the constructive acquiescence of senior "policy-making" defendant officials. Since policy making officials were plaintiff's supervisors, for example Brenda Arends was plaintiff's HR supervisor, who later on either provided an input on or directly influenced plaintiff's termination from Deloitte, their acts or edicts may fairly be said to represent the official policy of defendant, Deloitte Consulting LLP.

322. Similarly, since the defendants Deloitte and Facebook acted in concert, the discriminatory practices of human resource professionals at Deloitte were so persistent or widespread as to constitute a "*custom or usage under law*" and negatively influence Facebook's hiring of the plaintiff. Upon knowledge & belief, Deloitte actively schemed against the plaintiff to deprive him of a job opportunity, and their acts to derail plaintiff's recruitment with Facebook cannot go unnoticed.

**COUNT THIRTEEN**

**(Against Defendants Facebook and Deloitte Consulting LLP)**

**DEPRIVATION OF RIGHTS**

*[in violation of Federal Laws, 42 USC § 1983, New York State Laws]*

323. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

324. Plaintiff is a person with disability. Under Americans with Disabilities Act (ADA), the Congress has placed express private rights of action into legislation. See Americans with Disabilities Act, 42 U.S.C. § 12188 (a)(1) ("The remedies and procedures set forth in [the Act] are . . . provid[ed] to any person who is being subjected to discrimination on the basis of disability in violation of [this Act].") (emphasis added)

325. Plaintiff is a person with disability. Section 36.501 of the Americans with Disability Act

(ADA) Title III Regulation 28 CFR Part 36 allows private suits. Plaintiff was subjected to discrimination in violation of section 303 of the act or subpart D. The plaintiff was subjected to discrimination on the basis of his disability, in violation of section 42 USC 12183 of this subtitle by the defendants on this lawsuit.

326. Facebook recruiter and Deloitte State actor had a meeting of mind to reach an understanding (express or tacit) not to hire the plaintiff. Thus, it can be inferred that Facebook recruiter was aware of the involvement and influence of White State Actors, and intertwined factors of disability, gender, race or national origin-based discrimination faced by the plaintiff at Deloitte.

327. Facebook knew that plaintiff's female relatives with government affiliations either worked for Deloitte or Facebook. Given their concern to protect the privacy or security of family members of current or former State Actors, and their business need to shelter themselves from liabilities and extended litigation possibilities, it can be established that Facebook and Deloitte shared intent or community of purpose

328. Defendant State Actors abused their official positions, and resources for the purpose of perpetuating the abuse of Plaintiff and depriving him of his civil and constitutional rights, controlling activities of Plaintiff, willfully endangering Plaintiff health, well-being, reputation, and harming his reputation, privacy, quality of life, and personal and economic prospects. Defendant actions violate 42 USC § 1983

329. Defendant Deloitte state actors have continued to manipulate plaintiff's electronic communications, media information and news. Such defendant's actions continue to harm the plaintiff in a manner or pattern that form the basis of Deloitte's continuing violations against the plaintiff.

330. The actions of defendant have damaged, and will continue to damage, Plaintiff's economic situation, income, prospects of future income, civil and constitutional rights, and reputation, unless the acts of Defendant complained of herein are enjoined during the pendency of this action and thereafter.

331. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial. As such, Plaintiff seeks damages on this Cause of Action in an amount to be determined at trial, but in no event less than $1,000,000.00.

**COUNT FOURTEEN**

**(Against Defendants Facebook and Deloitte Consulting LLP)**

**CONSPRIRACY TO INTERFERE WITH CIVIL RIGHTS**

*[in violation of Federal Laws, 42 USC § 1985]*

332. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

333. Facebook recruiter and Deloitte State actor had a meeting of mind to reach an understanding (express or tacit) not to hire the plaintiff. Thus, it can be inferred that Facebook recruiter was aware of the involvement and influence of White State Actors, and intertwined factors of disability, gender, race or national origin-based discrimination faced by the plaintiff at Deloitte.

334. The plaintiff has identified the involvement of state actors and the understanding or agreement (express or tacit) between state actor and a private entity. Facebook's denial of plaintiff's employment petition on April 3rd 2018, followed by Deloitte state actor Austin Perez's inconsistent and biased investigation on April 6th 2018 provide an inference that they acted in concert to inflict a constitutional injury upon the plaintiff.

335. The plaintiff has clearly identified that Deloitte conducted an inconsistent and incomplete investigation despite credible evidence and witnesses identified by the plaintiff to conceal their discriminatory practice of assigning a false non-discriminatory reason for adverse employment action, and to conceal their internal coordination with female supervisors.

336. Furthermore, Deloitte conspired with Facebook to deny the plaintiff of his rights to conceal such discriminatory practices, and to ensure that the firms limit their possibilities of getting entangled into prolonged litigation and liabilities as identified. In order to accomplish such objectives, the

firms interfered with plaintiff's protected rights / characteristics or civil rights based on race, national origin, disability and gender.

337. Upon information and belief, Defendant has knowingly abused their official positions, and resources for the purpose of perpetuating the abuse of Plaintiff and his civil and constitutional rights, controlling activities of Plaintiff, willfully endangering Plaintiff health, well-being, reputation, and harming his reputation, privacy, quality of life, and personal and economic prospects. Defendant actions violate 42 USC § 1985

338. Deloitte has continued to retaliate against the plaintiff for a period of five or more years. Because of the direct actions of Deloitte, Joanna Rohde and their female human resource professionals, plaintiff has been deprived of employment opportunities and livelihood. Deloitte's actions to deprive the plaintiff of livelihood over a period of five or more years and their continued retaliation against the plaintiff provides direct inference of the severity and the extent of their violations against the plaintiff.

339. The Plaintiff has alleged that White Deloitte professionals like Joanna Rohde and Christina Young held race-based bias against the plaintiff. Based on such actions, one could draw the reasonable inference that Deloitte Consulting harassed the plaintiff in part because plaintiff's race, ethnicity or national origin. Deloitte acted in furtherance of their conspiracy to not allow the plaintiff to secure a gainful employment position acted in concert with Facebook.

340. Plaintiff has identified specific racial animus by defendant Deloitte Consulting LLP, and that Deloitte and Facebook acted in concert. Based on plaintiff's allegations, it can be inferred that if plaintiff and his female relative working at Facebook were White US Citizens or Nationals, the plaintiff would not have been discriminated by Deloitte, and, conversely, Facebook would not have refused to hire the plaintiff.

341. Plaintiff has identified specific racial animus on the part of defendant Facebook. After getting aware of plaintiff's gender discrimination, sexual harassment and racial discrimination claims against Deloitte, one could draw the reasonable inference that Facebook recruiter maintain a racial bias towards the plaintiff, and/or her actions were "tainted with ... racial animus"

342. At all times defendant Deloitte was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff. Defendant Facebook treated similarly situated applicants outside of plaintiff's protected class better than the plaintiff.

343. Since the acts of Deloitte, Facebook, and the State actors supporting Deloitte were themselves discriminatory, one can infer that such entities and their employees were motivated by racial or class-based invidious discriminatory animus behind their action. For instance, Defendant Facebook treated similarly situated White US Citizens or Nationals better than the plaintiff.

344. The actions of defendant have damaged, and will continue to damage, Plaintiff's economic situation, income, prospects of future income, civil and constitutional rights, and reputation, unless the acts of Defendant complained of herein are enjoined during the pendency of this action and thereafter.

345. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial. As such, Plaintiff seeks damages on this Cause of Action in an amount to be determined at trial, but in no event less than $1,000,000.00.

## COUNT FIFTEEN

**(Against Defendants Facebook and Deloitte Consulting LLP)**

**TAMPERING AND RETALIATION AGAINST WITNESSES, VICTIM, INFORMANT**

*[in violation of Federal Laws, Federal Tort Claim Act, New York State Laws]*

346. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

347. Plaintiff is a person with disability. Under Americans with Disabilities Act (ADA), the Congress has placed express private rights of action into legislation. See Americans with Disabilities Act, 42 U.S.C. § 12188 (a)(1) ("The remedies and procedures set forth in [the Act]

are . . . provid[ed] to any person who is being subjected to discrimination on the basis of disability in violation of [this Act].") (emphasis added)

348. Plaintiff is a person with disability. Section 36.501 of the Americans with Disability Act (ADA) Title III Regulation 28 CFR Part 36 allows private suits. Plaintiff was subjected to discrimination in violation of section 303 of the act or subpart D. The plaintiff was subjected to discrimination on the basis of his disability, in violation of section 42 USC 12183 of this subtitle by the defendants on this lawsuit.

349. Under the Americans with Disability Act, the plaintiff has private right of action for tampering and/or retaliation against witness, victim or informant.

350. The plaintiff engaged in protected activity by providing the details of his disability / medical condition to Deloitte.

351. The plaintiff engaged in protected activity by filing an ethics and integrity violation report with Deloitte.

352. The plaintiff was falsely accused of sexual harassment by a White female Supervisor Professional twice his age. Her inconsistent statements on the issue and her actions with Deloitte female HR professionals allow the plaintiff to be identified as a member of a protected class.

353. The plaintiff was himself a witness on such protected activities at Deloitte. In addition, the plaintiff filed a court complaint against Deloitte in early 2019, and his position as a witness continues to be protected by law.

354. In order to maintain an illegal control over the plaintiff and to harm plaintiff's financial, economic and employment prospects, Deloitte retaliated against the plaintiff to ensure that he could not secure alternate employment at Facebook.

355. It can be inferred that both Facebook and Deloitte shared the **same intent or community of purpose** that had plaintiff been selected and recruited by Facebook, the Deloitte female supervisors who raised gender discrimination issues against the plaintiff or the Deloitte female/s

with a protected characteristic or factors such as pregnancy may **entangle both Facebook and Deloitte into needless litigation** based on both plaintiff's employment and the employment of plaintiff's female relatives, and such litigation can be initiated during an extended period of time.

356. Upon information and belief, Defendants have intentionally, knowingly, and tortiously tampered with plaintiff in their attempts to adversely influence Plaintiffs behavior and conduct, to maintain illegal control of Plaintiff. Defendants' actions violate Federal Laws and/or similarly applicable New York State and New York City Laws

357. Upon information and belief, Defendants have intentionally, knowingly, and tortiously retaliated against Plaintiff in their attempts to adversely influence Plaintiffs behavior and conduct, to maintain illegal control of Plaintiff, and to intimidate Plaintiff. Defendants' actions violate Federal Laws, and/or similarly applicable New York State and New York City Laws.

358. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial, and in a manner and amount that may not be fully measured or compensated in economic terms, and/or for which there may not be adequate remedy at law to stop the unlawful or wrongful acts. The actions of Defendants have damaged, and will continue to damage, Plaintiff's economic situation, income, prospects of future income, civil and constitutional rights, and reputation, unless the acts of Defendants complained of herein are enjoined during the pendency of this action and thereafter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for Judgement against defendant as follows:

1. The Plaintiff demands judgment against Defendant Facebook in the amount set forth by a jury and for relief requested herein, back pay with prejudgment interest and all the fringe benefits to which he is entitled; pain and suffering, front pay and benefits; actual and punitive damages, and costs incurred because of the Defendant's unlawful behavior; including costs, disbursements, and attorney's fees to the extent permitted by law, and for such and other further

relief that this Court deems just, proper and equitable.

2. That the defendant Facebook be required to pay Plaintiff amount set forth by a jury and for relief requested herein, including front pay and benefits; actual and punitive damages, and costs incurred because of the Defendant's unlawful behavior, including all civil penalties authorized by law.

3. That the defendants Deloitte and Facebook be required to pay plaintiff such damages as plaintiff has sustained, or will sustain, in consequence of defendants abuse of plaintiff's economic, civil and constitutional rights, loss of professional or business income, loss of personal property or profits owned by plaintiff and destroyed by defendants, loss of reputation and willful endangerment, but in no event less than a reasonable compensation for services and damages, accounting all gains and advantages derived by defendants that are attributable to such unlawful acts that relate to the matters described in this complaint, as defined by Federal and State laws, including all civil penalties authorized by law.

4. That the defendants be required to pay plaintiff such all costs related to this action, including interests, and any reasonable future attorney fees (if applicable) with interest if the plaintiff requires so by law, including all civil and criminal penalties authorized by law.

5. That plaintiff be granted such other and further relied upon relief as this court may deem just, proper and equitable

Yours, etc.,

**Ashu Shukla**
*_s_ashu shukla*
*Plaintiff*
202 Salem CT, Apt#11
Princeton, NJ 08540
ashu.shukla@gmail.com
T # 917-488-6143

## VERIFICATION

On October 25th, 2023, the Plaintiff declares that all statements on this Complaint, and are verified to be true under the penalties of perjury, pursuant to CPLR 2016. He had read the complaint, and he believes the matters stated to be alleged in the above sections of the complaint to be true. The source for this information and the ground for his belief were derived from the facts and evidence file maintained in the normal course of business by the plaintiff.

Discovery evidence has also been provided by the defendant Deloitte Consulting LLP as part of their duty to disclose documents on plaintiff's employment lawsuit.

Dated: New York, New York
October 25th, 2023

Yours, etc.,

**Ashu Shukla**
*_s_ashu shukla*
*Plaintiff*
202 Salem CT, Apt#11
Princeton, NJ 08540
ashu.shukla@gmail.com
T # 917-488-6143